THE PEOPLE *ex rel.* William H. Woodyatt

*v.*

JAMES H. THOMPSON, County Clerk.

*Filed at Springfield April 2, 1895.*

1. MANDAMUS—*to compel issuance of election notices—questions presented.* One seeking to compel, by *mandamus*, the issuance of election notices under a former act, on the ground that a later act is unconstitutional, is not entitled to relief where the earlier act, under the same test, is also found invalid.

2. COURTS—*have jurisdiction to determine validity of apportionment acts.* The courts have jurisdiction to determine whether an act apportioning senatorial districts is or is not in conflict with the constitution; and such jurisdiction is not affected, when the question is properly raised in a suit at law, by the fact that only political rights of the parties are involved.

3. SAME—*cannot inquire into motives of the legislature.* The courts can not inquire into the motives which may have moved the legislature to enact a statute making an apportionment of senatorial districts in the manner in which it was made, such motives being presumed to be patriotic.

4. SAME—*question whether act is within the legislative discretion, is judicial.* Although the decision of the legislature, in the exercise of its discretion as to the apportionment of senatorial districts, is final, and not subject to review by the courts, yet jurisdiction exists in the courts to determine whether or not the statute is within such discretion.

5. SAME—*senatorial districts—questions of compactness of territory and equality of population.* The question whether the constitutional requirements of compactness of territory and equality of population in senatorial districts have been applied at all, is one which the courts may finally determine; but whether or not the nearest practicable approximation to perfect compactness and equality has been attained is a question for the legislative discretion.

6. SAME—*cannot go beyond the constitution for restrictions upon legislative power.* The courts are not at liberty to go beyond the constitution and set up a standard of their own, based upon what might be deemed the inalienable rights of men, or the fundamental principles of right and justice or of republican government, or some principle supposed to underlie the constitution, by which to measure the validity of an apportionment act.

7. CONSTITUTIONAL LAW—*statute has benefit of reasonable doubt as to constitutionality.* In case of reasonable doubt as to whether a statute is constitutional or not, the courts will incline in favor of the law, and hold it valid.

8. SAME—*senatorial districts—limitations to requirement of "contiguous and compact" territory.* The requirements of the constitution that senatorial districts be formed of contiguous and compact territory, and contain, as nearly as practicable, an equal number of inhabitants, are subordinate to the requirements that such districts shall be bounded by county lines, and that a county cannot be divided unless it contains a sufficient population to entitle it to two or more senators.

9. SAME—*reasonable approximation toward equality of population sufficient.* Only a reasonable approximation toward equality is essential, under the requirements of the constitution that senatorial districts shall contain, as nearly as practicable, an equal number of inhabitants.

10. SAME—*State constitution a limitation upon and not a grant of power.* A State constitution is a limitation upon the powers of the legislature, and not a grant of power; and the legislature possesses every power not delegated to some other department or to the Federal government, or not denied to it by the constitution of the State or of the United States.

11. SAME—*right of citizen to proportionate representation protected.* The right of a citizen to proportionate representation in the legislature, so far as it can be practically carried into effect by the instrumentalities of human government, is recognized and protected by the constitution.

12. SAME—*ordinance of 1787 not in force in Illinois.* The ordinance of 1787, passed by the Congress of the Confederation for the government of the Northwest Territory, has no force in Illinois except so far as its principles are embodied in the State constitution.

13. SENATORIAL DISTRICTS—*when act defining is unconstitutional.* An act apportioning senatorial districts is unconstitutional if it appears that the constitutional requirements of compactness of territory and equality in population have been *wholly* ignored, and not considered or applied to any extent; but if considered and applied, although to a limited extent only, subject to the other more definite limitations, the act is constitutional, although the legislature may have imperfectly performed its duty.

14. SAME—*the word "compact," as applied to, defined.* The word "compact," as used in the requirement of the constitution that senatorial districts shall be composed of "contiguous and compact territory," means closely united; and the whole requirement means, that counties or subdivisions of counties, when combined to form a district, must not only touch each other, but be closely united territorially.

15. SAME—*relation of "compactness" to equality of population.* The provision of the constitution requiring compactness of territory in election districts, subject, as it is, to more definitely expressed

requirements, may also, in application, be modified by the require-
ment of equality in population.

16. SAME—*test of statutory apportionment of.* A statute forming
senatorial districts is not void because some districts, although .
containing several thousand more inhabitants than the minimum
required by the constitution, should have contained still more and
others still less in order more nearly to approximate perfect equal-
ity, nor because some districts might have been made more com-
pact, these being matters within the legislative discretion.

APPEAL from the Circuit Court of Lee county; the
Hon. JOHN CRABTREE, Judge, presiding.

CHARLES B. MORRISON, State's Attorney, GEORGE
HUNT, S. H. BETHEA, and E. S. SMITH, for appellants :

The court has jurisdiction to determine the validity
of an apportionment act. *State* v. *Cunningham*, 81 Wis.
440, and 83 id. 90 ; *People* v. *Rice*, 135 N. Y. 473 ; *People* v.
*Broom*, 138 id. 95 ; *Board of Supervisors* v. *Secretary of State*,
92 Mich. 638 ; *Giddings* v. *Blacker*, 93 id. 1; *Parker* v. *State*, '
133 Ind. 178 ; *Prouty* v. *Stover*, 11 Kan. 235 ; *State* v. *Francis*,
26 id. 724; *People* v. *Canaday*, 73 N. C. 198 ; *State* v. *Dudley*,
1 Ohio St. 317; *Kinney* v. *Syracuse*, 30 Barb. 349; *Warner* v.
*Mayor*, 2 Gray, 84 ; *People* v. *Holihan*, 29 Mich. 116 ; *People*
v. *Bradley*, 36 id. 447; *Opinions of Judges*, 6 Cush. 575 ; *Boyd*
v. *Nebraska*, 143 U. S. 135 ; *Fletcher* v. *Tuttle*, 151 Ill. 41.

Courts may consider the constitutionality of a law
providing for the election of presidential electors, (*Mc-
Pherson* v. *Blacker*, 146 U. S. 1,) and the validity of a rule
of the House of Representatives. *United States* v. *Ballin*,
144 U. S. 1.

If one or more districts are formed in violation of the
constitutional provisions, the entire act is invalid. *State*
v. *Cunningham*, 81 Wis. 440 ; *Bittle* v. *Stuart*, 34 Ark. 224;
*Jones* v. *Jones*, 104 N. Y. 234; *Black* v. *Frower*, 79 Va. 123.

When the provisions of a statute are so interdepend-
ent that one may not operate without the other, or so
related in substance and object that it is impossible to
suppose that the legislature would-have passed the one

454 THE PEOPLE v. THOMPSON. [April

without the other, the whole must fall. 23 Am. & Eng. Ency. of Law, 226 ; *Darby* v. *Wilmington*, 76 N. C. 133; *Eckhart* v. *State*, 5 W. Va. 515 ; *Fant* v. *Gibbs*, 54 Miss. 396 ; *Stark* v. *Stark*, 18 Fla. 255 ; *People* v. *Cooper*, 83 Ill. 585.

When a repeal is intended to clear the way for the operation of the act containing it, thereby showing an intention to displace the old with the new, if the latter is unconstitutional the repealing clause would be dependent and inoperative. Sutherland on Const. Construction, sec. 136 ; *Campau* v. *Detroit*, 14 Mich. 276 ; *Ex parte Davis*, 21 Fed. Rep. 396; *People ex rel.* v. *Fleming*, 7 Col. 230; *Quinlon* v. *Rogers*, 12 Mich. 168.

The repealing clause, where it is passed to give clear operation to the subject matter of an unconstitutional act, is inoperative. *State* v. *Commissioners*, 38 N. J. L. 320; *Childs* v. *Shower*, 18 Iowa, 261; *Stark* v. *Stark*, 18 Fla. 255 ; *Quinlon* v. *Rogers*, 12 Mich. 168; *Commissioners* v. *Hitching*, 5 Gray, 482.

The court will take judicial knowledge of the location, general boundaries and the juxtaposition of the several counties, towns and wards mentioned in the act. *State* v. *Cunningham*, 83 Wis. 90; *Parker* v. *State*, 133 Ind. 178.

The Apportionment act contravenes the provisions of the constitution requiring the districts to be formed of contiguous and compact territory, and to contain, as nearly as practicable, an equal number of inhabitants. *State* v. *Cunningham*, 81 Wis. 440, and 83 id. 90 ; *Parker* v. *State*, 133 Ind. 178 ; *Board of Supervisors* v. *Secretary of State*, 92 Mich. 638 ; *Giddings* v. *Secretary of State*, 93 id. 1; Ordinance of 1787, art. 2 ; Const. of 1818, art. 2, sec. 5 ; Const. of 1848, art. 3, secs. 6, 8 ; Const. of 1870, art. 4, sec. 6.

MAURICE T. MOLONEY, Attorney General, T. J. SCOFIELD and M. L. NEWELL, of counsel, also for appellants.

S. P. SHOPE, and D. P. PHELPS, for appellee :

A law will be upheld unless its unconstitutionality is so clear as to leave no doubt on the subject. *Kelly* v.

*Meeks,* 87 Mo. 396; *Robinson* v. *Schenck,* 102 Ind. 307; *Petition of Wellington,* 16 Pick. 87; *Alexander* v. *People,* 7 Col. 155; *Crowler* v. *State,* 11 Ore. 512; Cooley's Const. Lim. 216.

The constitution apportions the powers of the government, but it does not make any one of the three departments subordinate to another when exercising the trust committed to it. Cooley's Const. Lim. 192; *Bates* v. *Kimball,* 2 Chip. 77; *Bailey* v. *Railroad Co.* 4 Harr. 389; *Whittington* v. *Polk,* 1 H. & J. 236; *Hawkins* v. *Governor,* 1 Ark. 570; *People* v. *Governor,* 29 Mich. 320.

The moment a court ventures to substitute its own judgment for that of the legislature, in any case where the constitution has vested the legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion, alone, will measure the extent of its interference. Cooley's Const. Lim. 200; *Beebe* v. *State,* 6 Ind. 501; *Hills* v. *Chicago,* 60 Ill. 86.

Nothing but a clear violation of the constitution or a clear usurpation of power prohibited will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void. *Railroad Co.* v. *Riblet,* 66 Pa. St. 164; *Railway Co.* v. *Smith,* 62 Ill. 268; *Munn* v. *Illinois,* 94 U. S. 113; *United States* v. *Brown,* 1 Deady, 566.

Courts are not at liberty to declare an act void because, in their opinion, it is opposed to a spirit supposed to pervade the constitution but not expressed in words. Cooley's Const. Lim. 204; *Cochran* v. *Van Surlay,* 20 Wend. 365; *Wynehamer* v. *People,* 13 N. Y. 378.

Courts cannot inquire into legislative motives. They must assume that legislative discretion has been properly exercised. Cooley's Const. Lim. (6th ed.) 220, 221; *People* v. *Lawrence,* 36 Barb. 177; *People* v. *Railroad Co.* 34 id. 123; *Goddin* v. *Crump,* 8 Leigh, 154; *Railroad Co.* v. *Cooper,* 33 Pa. St. 278; *Ex parte Newman,* 9 Cal. 502; *Bal-*

*timore* v. *State*, 15 Md. 376; *Johnson* v. *Goggins*, 3 Metc. (Ky.) 566.

The apparent inequalities in the apportionment of members of the assembly and senators is a question of fact, within the discretion of the legislature, and cannot be reviewed by the court. *Arnold* v. *Reese*, 18 N. Y. 56; *Rumsey* v. *People*, 19 id. 48; *Supervisors* v. *People*, 7 Hill, 505; *People* v. *Draper*, 15 N. Y. 533; *Prouty* v. *Stover*, 11 Kan. 261.

Courts will not be allowed to pass upon the reasonableness or unreasonableness of laws. Smith's Com. chap. 7; *Opinions of the Judges*, 10 Gray, 616.

There is no revisionary jurisdiction over legislative action resting in judgment. *Phelps* v. *Rooney*, 9 Wis. 91; *Harraman* v. *Insurance Co.* 49 id. 85; *State ex rel.* v. *Whitford*, 54 id. 150; *Land Co.* v. *Brown*, 73 id. 304; *State ex rel.* v. *McCann*, 21 Ohio St. 198; *Georgia* v. *Stanton*, 6 Wall. 50; *Commonwealth* v. *McClosky*, 2 Rawle, 374; *Madison and Ind. Arco.* v. *Whiteneck*, 8 Ind. 222; *Bull* v. *Reed*, 13 Gratt. 98; *Goddin* v. *Crump*, 8 Leigh, 154; *State* v. *Jarrett*, 17 Md. 327; *Wise* v. *Bigger*, 79 Va. 269.

The act of altering the senate districts and apportioning members of the assembly by the legislature is not within the power of the judiciary to review. *Marburry* v. *Madison*, 1 Cranch, 67; *Kilbourn* v. *Thompson*, 103 U. S. 168; Cooley's Const. Lim. 192.

The right to question a law on the ground of its unconstitutionality, and to invoke judicial power, is confined to one, only, whose complaint discloses an injury to him, his property or his rights. Cooley's Const. Lim. 163; *Petition of Wellington*, 16 Pick. 96; *Hingham B. & T. Corp.* v. *Norfolk*, 6 Allen, 357.

This suit is for the enforcement of a political right. *Blair* v. *Hinrichsen*, 151 Ill. 52.

A private citizen has no authority to bring this suit, or a suit of this character, which specially relates to political subjects. *Judd* v. *Fox Lake*, 28 Wis. 587; *Doolittle* v. *Supervisors*, 18 N. Y. 155; *Sparhawk* v. *Railroad Co.* 54

Pa. St. 401; *Davis* v. *Mayor*, 2 Duer, 663 ; 14 N. Y. 506 ;
*Hale* v. *Cushman*, 6 Metc. 425 ; *Gobbs* v. *Green*, 54 Miss. 593;
*Commonwealth* v. *Burrell*, 7 Pa. St. 34; *Newark Aq. 4* v.
*Passaic*, 45 N. J. Eq. 393 ; *Jones* v. *Black*, 48 Ala. 540 ; *Seager*
v. *Kankakee*, 102 Ill. 69 ; *Walton* v. *Develing*, 61 id. 201;
*Dickey* v. *Reed*, 78 id. 261; *Chicago* v. *Building Ass.* 102 id.
391 ; Story's Eq. Pl. sec. 8; *Attorney General* v. *Parker*,
126 Miss. 221; *Attorney General* v. *Evart B. Co.* 34 Mich.
462 ; *Burbank* v. *Burbank*, 152 Mass. 462 ; *Harris* v. *Shyrock*,
82 Ill. 119.

Mr. JUSTICE CARTER delivered the opinion of the court:

This suit involves the constitutionality of an act of
the Thirty-eighth General Assembly, approved June 15,
1893, making an apportionment of the State into sena-
torial districts. A petition in the name of the People, on
the relation of William Woodyatt, by Charles B. Morri-
son, as State's attorney of Lee county, for a writ of *man-
damus*, was filed on the 15th day of October, 1894, in the
circuit court of Lee county, against the appellee, James
H. Thompson, as county clerk of that county, to compel
him to make and deliver to the supervisors of the sev-
eral townships, notices for the election of one senator
and three representatives at the November election, 1894,
for the territory which, under the Apportionment act of
1882, would be the nineteenth senatorial district, com-
posed of the counties of Lee and Whiteside. By the act
of 1893, making a new apportionment of the State into
senatorial districts for the election of senators and rep-
resentatives to the General Assembly and repealing the
act of 1882, Lee county was placed with DeKalb, Kendall
and Grundy counties, to form the twenty-ninth district.

The petition alleges that the districts formed by the
act of 1893 are not formed of contiguous and compact
territory, and do not contain, as nearly as practicable, an
equal number of inhabitants, as required by the consti-
tution of the State. It further alleges that according to

the Federal census of 1890 the State contained 3,826,351 inhabitants; that the senatorial ratio, ascertained as provided by the constitution, is 75,026, that number being the quotient of the total number of inhabitants divided by fifty-one,—the number of districts to be formed; that of this total number of inhabitants Cook county had 1,191,922, and was entitled to fifteen senatorial districts, each having an average population of 79,461, leaving an average of only 73,178 for each of the thirty-six districts outside of Cook county. Many inequalities in population and wide departures from perfect compactness of territory of the several districts are pointed out in the petition, applying, perhaps, to as many as one-third of the total number of districts in the State. The inequalities in population of the districts outside of Cook county, of which complaint is made, vary between 62,007, the lowest, and 88,454, the highest, number of inhabitants in any district; but as applied to adjoining districts the differences in population which it is alleged might have been greatly reduced are not so great, amounting, however, in a few instances, to upwards of 24,000. It is also alleged that the districts in Cook county could and should have been formed of contiguous and compact territory, all containing substantially an equal number of inhabitants, but that, as formed by the act of 1893, they are not compact in territory and are grossly and unnecessarily unequal in population; and inequalities in numbers and departures from perfect compactness of territory, substantially as great as those pointed out in the districts outside of Cook county, are set forth in the petition.

As the objectionable features complained of appear about as fully in the twenty-ninth district, where the relator resides, composed of the counties of Lee, DeKalb, Kendall and Grundy, when compared with the adjoining twenty-fifth district, consisting of Will county alone, it is unnecessary to state the contents of the petition with further detail in respect to other districts. The differ-

ence in population between these two districts is 24,376, and it is alleged that if Grundy county, with a population of 21,024, had been joined to Will county to form the twenty-fifth district, leaving the twenty-ninth composed of Lee, DeKalb and Kendall, these districts would have been more compact in territory and an approach made toward equality in population of 6704, and that by reason of the facts stated, applicable to these and other districts mentioned, the act of 1893 is unconstitutional and void, and that the said county clerk should have been compelled to deliver the notices of the election for the election of a senator and three representatives from the nineteenth senatorial district formed by the act of 1882, instead of from the twenty-ninth district formed by the act of 1893.

The answer admits the general allegations of the petition, but denies that the districts are not formed of contiguous and compact territory, and denies that the relator is deprived of equal rights of representation in the General Assembly by the act of 1893, or that the rights of any citizen have been infringed thereby; and alleges that the districts contain, as nearly as practicable, an equal number of inhabitants. The answer further sets forth that the defendant has issued notices of election in the twenty-ninth district as formed by the act of 1893, and denies that Lee county forms a part of any other district; avers that the General Assembly has a discretion, in the formation of districts, as to population, limited only to the extent that the population of a district shall not vary from a senatorial ratio more than one-fifth of such ratio; that the passage of the act is a determination by the legislature that the several districts are formed of contiguous and compact territory, and as nearly equal in population as practicable, and that such determination is conclusive of those questions.

The trial court overruled petitioners' demurrer to the answer, and rendered judgment dismissing the petition,

and for costs, from which judgment this appeal is prosecuted by the petitioners.

Counsel for appellants say that the only question involved is the constitutionality of the Apportionment act of 1893, while counsel for appellee insist that the validity of the act of 1882 is equally involved. As the relator seeks relief under the act of 1882, on the assumption that it is still in force as a valid and constitutional act, it seems clear that if the act of 1893 be found invalid the act of 1882 must be subjected to the same constitutional test, and, if it also be found invalid, judgment must go against the relator to the same extent as if the act of 1893 should be found to be valid. Indeed, a plausible argument is made by counsel for appellee on the theory that it clearly appears that both acts are subject to the same vice, and that this court should proceed no further, but affirm the judgment on the ground that if one act be void both are, and that even if relator should succeed in having the act of 1893 set aside, he must still fail in his suit to establish the legal existence of the alleged nineteenth district formed by the act of 1882; that the court can be called upon to determine the constitutionality of a statute only when such determination is necessary in the decision of a cause, and that it is unnecessary in this case, because, whether the relator succeeds or fails in his attack on the act of 1893, he must lose his case,—both acts, if either should fall, going down together before the same onset. This view was taken by Mr. Justice ELLIOTT, of the Supreme Court of Indiana, in a separate opinion in a similar cause in that court, but a majority of the court held that the constitutionality of the apportionment acts there brought in question was fairly presented for decision. *Parker* v. *State*, 133 Ind. 178.

While we recognize the well settled and long established rule that courts will not go out of their way to pass upon the constitutionality of a statute assailed, but will decide the case on other grounds when other grounds

exist and the cause can be properly determined without considering whether the act be valid or invalid, we are of the opinion that the question of the validity of the Apportionment act of 1893 is not only fairly presented, but is necessarily involved in the decision of the case, and that if that act is found to be invalid, the question whether or not the act of 1882 is unrepealed and constitutional would then arise. *Parker* v. *State, supra.*

We are not disposed to evade the principal, and really important, questions raised, by giving undue importance to technical objections urged in the argument, whereby the case might possibly be decided but its purpose defeated. Nor will the court look away from the record or the issues, as made by the parties, to some ultimate and extrinsic purpose of the suit, to avoid any valid technical objection which, under our forms of legal procedure, should control the decision; but we shall not spend time on the preliminary questions raised, going to the competency of the petitioners to bring the suit and to the jurisdiction of the court to entertain it. We are disposed to hold that the suit is properly brought, and that the court has jurisdiction. It would be a legal anomaly if the legislature could enact a statute in clear conflict with the express limitations fixed by the constitution, in a matter of vital importance to all the people of the State, and the courts have no jurisdiction to pass upon the validity of such statute when directly involved in a pending case. It is not meant to be here said that the act or acts in question is or are in clear conflict with the limitations expressly fixed by the constitution, but only that the courts have jurisdiction to determine whether it is so or not, and if such conflict be found to exist, to declare such act or acts void, and that this jurisdiction is not affected, when the question is properly raised in a suit at law, by the fact that only political rights of the parties are involved, nor by the contention that the statute in question is the mere product of the exercise of that

political power residing in the legislature, wherein its decision is final. It is undoubtedly true that, so far as the act in question is the expression of the unabridged discretion reposed in the legislature, its decision must be final and not subject to review by the courts; but the courts have jurisdiction to interpret and construe the constitution and the statute in order to determine whether the act is within the legislative discretion or not.

As the cause has been argued, orally and in writing, with very great ability by counsel on both sides, our labors have been as much reduced as would be possible in any case where difficult questions of such grave and far-reaching importance are involved.

That part of section 6 of article 4 of the constitution which appellants insist has been violated by the act of 1893 is as follows: "The General Assembly shall apportion the State every ten years, beginning with the year 1871, by dividing the population of the State, as ascertained by the Federal census, by the number fifty-one, and the quotient shall be the ratio of representation in the Senate. The State shall be divided into fifty-one senatorial districts, each of which shall elect one senator, whose term of office shall be four years. * * * Senatorial districts shall be formed of contiguous and compact territory, bounded by county lines, and contain, as nearly as practicable, an equal number of inhabitants, but no district shall contain less than four-fifths of a senatorial ratio. Counties containing not less than the ratio and three-fourths may be divided into separate districts, and shall be entitled to two senators, and to one additional senator for each number of inhabitants equal to the ratio contained by such counties in excess of twice the number of said ratio." The section providing for minority representation in the House of Representatives, adopted by the people in lieu of sections 7 and 8, which formed a part of the draft of the constitution as submitted to the people, provides that three representatives

shall be elected from each senatorial district. There is no difference, in our State, between the senatorial and representative districts, as in many of the States of the Union, but the territory of both is the same.

It will be noticed that in the formation of senatorial districts there are certain limits to the power of the General Assembly, prescribed by the constitution in such definite terms as to be readily recognized and understood by every one, without room for difference of opinion. These limitations may be stated as follows:

*First*—All districts, except those formed within counties having sufficient population to be divided into separate districts, must be bounded by county lines.

*Second*—A county cannot be divided into separate districts unless it contains at least one ratio and three-fourths, when it may be divided, and be entitled to two senators, and to one additional senator for every ratio in excess of two full ratios.

*Third*—No district shall contain less than four-fifths of the ratio.

*Fourth*—Districts shall be formed of contiguous territory.

It would seem incontrovertible that as to these four restrictions, by which the power of the General Assembly is definitely limited, no room is left for difference of opinion, in reasonable minds, as to their meaning, nor for the exercise of any legislative discretion except within the bounds of these limitations, it being clear that they must all be observed, in any sense which can be imputed to them, in the enactment of any valid apportionment statute. Nor is it claimed that in the act of 1893 or in the act of 1882 the legislature disregarded any of them. But there are other requirements contained in the section of the constitution above quoted, respecting the apportionment of the State, which, as qualified and made subject to the definitely expressed limitations above mentioned, are not so definite in meaning or easy of determination

as to preclude differences of opinion in reasonable minds, or as to fall so clearly without the bounds of legislative discretion. These are: That districts must be formed of compact territory, and contain, as nearly as practicable, an equal number of inhabitants. And it is in respect to these provisions that the present controversy arises. The only definite rule which can be deduced from these two requirements of the constitution, when controlled, as they must be, by those more definitely defined, (and as to whether it should be applied or not in making an apportionment all reasonable minds would agree, and the legislature could have no discretion,) may, we think, be stated as follows:

*Fifth*—In making an apportionment of the State, under the constitution, the legislature must have in view, and apply, the principles of compactness of territory and approximate equality in population in the formation of senatorial districts.

In applying these rules prescribed by the constitution itself, and by which the constitutionality of the statutes in question must be tested, it must be borne in mind that where there is any reasonable doubt as to whether a statute is constitutional or not, the courts will incline in favor of the law, and hold it valid. The rule is stated by Mr. Justice MAGRUDER in *People* v. *Gaulter*, 149 Ill. 47, as follows: "Courts ought not to declare an act of the legislature invalid unless it is in plain and obvious conflict with the constitution. Where there is a reasonable doubt of the validity of a statute, such doubt should be solved in favor of the legislative action, so as to sustain the statute. The presumptions are in favor of the constitutionality of a law passed by the legislature, and the courts will, if possible, give it such a construction as will enable it to have effect. *Lane* v. *Dorman*, 3 Scam. 238; *Newland* v. *Marsh*, 19 Ill. 376; Cooley's Const. Lim. (6th ed.) pages 216-218." This rule is so familiar and of such uniform application as to need no elaboration. It is sus-

tained by an unbroken line of authorities. (*Hawthorn* v. *People*, 109 Ill. 302; *People ex rel.* v. *Nelson*, 133 id. 565, and cases cited; *Gaines* v. *Williams*, 146 id. 450, and cases cited.) In the last of these cases, following the statement of the rule as stated by the Supreme Court of Pennsylvania, Mr. Chief Justice BAILEY said: "The right of the judiciary to declare a statute void, and arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases." *Wellington* v. *Petitioners*, 16 Pick. 87; *Ogden* v. *Saunders*, 12 Wheat. 213; *Parker* v. *State*, 133 Ind. 178; *Munn* v. *Illinois*, 94 U. S. 113; *Pennsylvania Railroad Co.* v. *Riblet*, 66 Pa. St. 164; *Railway Co.* v. *Smith*, 62 Ill. 268.

Keeping this rule of construction in mind, and having stated the rules prescribed by the constitution which are limitations upon the power of the General Assembly in making a senatorial apportionment, and which cannot be violated by that body in enacting any valid apportionment act, we will review, as briefly as we may, the questions involved, to ascertain whether or not the legislature has overstepped these constitutional limits in passing the statute in question.

The only county in the State having as many inhabitants as a ratio and three-fourths, at the time of the passage of either of the acts of 1882 or 1893, was the county of Cook, and it was therefore the only county that was, or could be, divided. The intention is plainly manifest in the constitution to preserve the integrity of the several counties in the formation of senatorial districts, except where a county has sufficient population to make it necessary to divide it into separate districts. The county being the most important political division of the State, its autonomy is expressly guarded by the constitution in the formation of these legislative districts, and in importance it is placed above the requirements of compactness of territory and equality in population. It might be a far less difficult matter to

divide the State into fifty-one senatorial districts, formed of contiguous and compact territory and each having substantially the same number of inhabitants, if no regard were paid to county lines. But it cannot be doubted that such an apportionment would be plainly unconstitutional, notwithstanding it would secure a compactness of territory and equality in population in the several districts not otherwise attainable. As every district outside of Cook county must, under the constitution, have been bounded by county lines, it is apparent that it was impossible to combine these counties, differing so radically in shape, size and population, so that there would be anything more than a reasonable approximation toward equality in population and perfect compactness of territory.

The subordination of the constitutional requirements of compactness of territory and equality in population to the indivisibility of counties is further shown by the provisions that a county must contain one ratio and three-fourths before it can be divided, and that no district can be formed having less than four-fifths of a ratio. As the ratio was 75,026 when the act of 1893 was passed, if there had been any county in the State having a population as great as, but not greater than, 131,000, in round numbers, such county could not have been divided, but must have been made a single district, entitled to only one senator and three representatives. This excess of 56,000 above the ratio would, so to speak, remain unrepresented, and would necessarily reduce the average population of other districts below the ratio. Such a result, which might arise, not only from the happening of the contingency supposed, but from others equally within the range of probability, such as the possibly necessary combination of counties each having nearly, but not fully, a sufficient number of inhabitants to form a district, must have been foreseen by the framers of the constitution, otherwise we cannot so readily understand

why the minimum number of inhabitants necessary to form a district should have been fixed at so low a fraction as four-fifths of the ratio, in view of the evident importance attached to the principle of equality in representation in the legislature. That no such great inequalities as above supposed have happened or become necessary in the formation of districts, does not lessen the force of the argument that under the constitution they could happen, and that in an apportionment conforming most closely to its requirements very great inequalities in population of different districts would result. Nothing more is proved, however, than that the integrity of the counties was considered of more importance in the formation of districts for representation in the legislature than equality in population; and it is by no means established that the legislature may form districts with such inequalities as it is shown might become necessary in a constitutional apportionment, when not compelled to do so by the necessary observance of county lines.

But a contingency within the provisions of the constitution, resulting in necessary inequality in representation among different districts and among different aggregations of districts, *has* happened, and demonstrates again that only a reasonable approximation toward equality can be secured. By dividing the population of Cook county by the ratio, 75,026, it is seen that it was necessary, under the constitution, to divide that county into fifteen districts, and no more, although a large fraction of the ratio, 66,532, remained unrepresented, so to speak,— or, more accurately, not equally represented. These 66,532 people, would, in any other county or counties, have been sufficient to form a district alone. This result could not have been avoided without a violation of the express provisions of the constitution.

But counsel for appellants have pointed out, in their argument, that there are sixteen districts outside of Cook county, eight of which together have an excess of

population of 174,997 over the other eight, or more than two full ratios. This result is obtained by selecting eight districts having the smallest number of inhabitants, and contrasting them with eight others having the largest number. It is also pointed out that greater equality in population and compactness of territory could have been attained in several of these sixteen districts, and in others, by the simple process of taking a county from one district as formed and adding it to another. This is true of the twenty-ninth district, in which the relator resides, as compared with the twenty-fifth, and which has been treated as a sample of the extreme cases complained of; and it is contended, with great force, that it being demonstrated that there was no necessity, arising from the constitutional requirements themselves, for these inequalities, the provision of the constitution requiring compactness of territory and equality, as nearly as practicable, in population, was violated, and that the statute is therefore null and void. It cannot, however, we think, be successfully maintained that any rule for our guidance in the decision of the case can be deduced from the mere fact that eight selected districts have more than two full ratios of population more than eight other selected districts. That might occur in an apportionment made in entire conformity to the constitution, where the observance of county lines made it necessary. So the only force,—but great, it must be admitted,—to be derived from the argument in this respect lies in the fact, of which the court must take judicial notice, that the mere observance of county lines required by the constitution did not, in many instances, make these inequalities, thus pointed out and complained of, necessary, for if an approach toward equality in population, of 6704, could have been made and the compactness of territory of the districts increased by taking a county from one district and adding it to another, without affecting the other districts as formed, it would seem clear that the

senators and representatives of the people must either
have made some mistake, or believed they had other good
and sufficient reasons for forming the particular districts
mentioned as they were formed, aside from the mere con-
stitutional observance of county lines.  It does not, of
course, appear, nor can it be presumed, that any mistake
of fact was made.  Nor can the courts inquire into the
motives which may have moved the General Assembly to
enact the statute in question making the apportionment
as it was made.  Mr. Chief Justice CHASE, in *Ex parte
McCardle,* 7 Wall. 506, said:  "We are not at liberty to
inquire into the motives of the legislature.  We can only
examine into its power, under the constitution."  This
well established rule has been laid down by many authori-
ties, and is not, of course, disputed by counsel.  Cooley's
Const. Lim. 220 ; *People* v. *Lawrence,* 36 Barb. 177; *People*
v. *New York Central Railroad Co.* 34 id. 123 ; *Baltimore* v.
*State,* 15 Md. 376; *Sunbury and Erie Railway Co.* v. *Cooper,*
33 Pa. St. 278; *People* v. *Draper,* 15 N. Y. 532; *Wright* v.
*Defrees,* 8 Ind. 298 ; *Doyle* v. *Continental Ins. Co.* 94 U. S.
535.  As one of the departments of the State govern-
ment, the General Assembly, composed of the immediate
representatives of the people, should be presumed to act
from patriotic motives.

While the jurisdiction of the court is in nowise affected
by any political effect which might be expected to flow
from the statute, or from our construction of it, and of
the constitutional provision under which it was enacted,
still the reluctance which this court and other courts of
last resort in the several States, as well as that of the
nation itself, have always expressed to declare an en-
actment of the legislative department unconstitutional,
ought not to be lessened when questions of a political
character are involved.

The really difficult question in the case is to determine
the bounds fixed by the constitution to the discretion of
the General Assembly, when that body, acting within

other and more definitely expressed limitations, is complying with the constitutional mandate to form senatorial districts of compact territory, containing, as nearly as practicable, an equal number of inhabitants. If the statute is within those bounds, though resulting in inequality and injustice, it is valid, for the courts have no power to revise or annul an act of the legislature which is the mere exercise of its discretionary power, or which rests in the legislative judgment. Cooley's Const. Lim. 54, 129; *Georgia* v. *Stanton,* 6 Wall. 50; *Phelps* v. *Rooney,* 9 Wis. 91; *Harriman* v. *Queen Ins. Co.* 49 id. 85; *Land Co.* v. *Brown,* 73 id. 304; *State* v. *McCann,* 21 Ohio St. 198; *Dodge* v. *Cole,* 97 Ill. 338; *Parker* v. *State,* 133 Ind. 178; 3 Am. & Eng. Ency. of Law, 683, note; *Fall* v. *Sutter,* 21 Cal. 237; *Porter* v. *Railroad Co.* 76 Ill. 561; *Wilcox* v. *People,* 90 id. 186. In *Dodge* v. *Cole, supra,* (p. 357,) Mr. Justice MULKEY said: "Just where the dividing line is to be drawn between judicial and legislative power, with respect to certain subjects, often presents questions about which enlightened courts and eminent jurists widely differ."

Article 3 of the constitution provides that "the powers of the government of this State are divided into three distinct departments—the legislative, executive and judicial; and no person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted." The legislative power is vested in the General Assembly, and whether or not the power to apportion the State into senatorial districts be deemed legislative, it is expressly vested in the legislative department by the constitution. Besides, "no proposition is better settled than that a State constitution is a limitation upon the powers of the legislature," and not a grant of power, and that the legislature possesses every power not delegated to some other department or to the Federal government, or not denied to it by the constitution of the State or of the United States.

*Field* v. *People*, 2 Scam. 79; *Sawyer* v. *City of Alton*, 3 id. 127; *Mason* v. *Wait*, 4 id. 127; *Winch* v. *Tobin*, 107 Ill. 212; *Harris* v. *Whiteside County*, 105 id. 445; *People* v. *Wilson*, 15 id. 388; *People* v. *Wall*, 88 id. 75; *Burritt* v. *Commissioners*, 120 id. 322. So it will be seen that the legislature has all the power of the people over the apportionment of the State into senatorial and representative districts not denied to it by the constitution.

Counsel for appellants, evidently realizing the extreme difficulty of determining, by legal interpretation or construction, the precise bounds fixed to the discretionary power of the General Assembly in applying the constitutional requirements of compactness of territory, and equality, as nearly as practicable, in population, when forming districts, while at the same time complying with other more definite limitations, have cited and quoted from the ordinance of 1787, passed by the Congress of the Confederation for the government of the Northwest Territory. This ordinance provided, among other things, that "so soon as there shall be 5000 free male inhabitants of full age in the district, upon giving proof thereof to the Governor they shall receive authority, with the time and place, to elect representatives from their counties or townships to represent them in the General Assembly;" and that "*the inhabitants of said territory * * * shall always be entitled to the benefits of * * * a proportionate representation of the people in the legislature.*"

Counsel do not seem to contend that this ordinance, even if to be treated as in force in this State, has any extra-constitutional force, but refer to it as evidence of the inheritance by the people of a State carved from that territory, of the right to equal representation in the legislature as a birthright. We do not think that the existence of this right, so far as it can be practically carried into effect by the instrumentalities of human government, imperfect at best, will be denied by any one. It is a right recognized and protected by the constitution to the ex-

tent thought necessary and practicable at the time of the adoption of that instrument. But if it be contended that the ordinance of 1787 has, on this subject, any force in this State except so far as its principles are embodied in the constitution, with that contention we cannot agree, but must hold the constitution—not the ordinance of 1787 —to be the supreme law by which the statute in question must be tested, it not in anywise interfering with any power delegated to the Federal government nor denied by the Federal constitution to the State.

The Supreme Court of the United States has in numerous cases decided that the ordinance of 1787 has become inoperative. In *Sands* v. *Manistee River Improvement Co.* 123 U. S. 288, that court said: "The ordinance of 1787 was framed a year and some months before the constitution of the United States went into operation. Its framers, and the Congress of the Confederation, which passed it, evidently considered that the principles and declaration of rights and privileges expressed in its articles would always be of binding obligation upon the people of the territory. The ordinance, in terms, ordains and declares that its articles 'shall be considered as articles of compact between the original States and the people and States in said territory, and forever remain unalterable unless by common consent.' And for many years after the adoption of the constitution its provisions were treated by various acts of Congress as in force, except as modified by such acts. In some of the acts organizing portions of the territory under separate territorial governments, it is declared that the rights and privileges granted by the ordinance are secured to the inhabitants of those territories; yet from the very condition on which the States formed out of that territory were admitted to the Union, the provisions of the ordinance became inoperative, except as adopted by them. All the States thus formed were, in the language of the resolutions or acts of Congress, admitted into the Union

on an equal footing with the original States, *in all respects whatever.*" And in *Escanaba, etc. Co.* v. *City of Chicago*, 107 U. S. 678, where it was insisted that the ordinance was in force in Illinois and prevailed over certain municipal regulations under which bridges were maintained across the Chicago river, which, it was claimed, interfered with the free navigation of that river forever guaranteed by said ordinance, the Supreme Court said, that although the enabling act of 1818, and other acts of Congress mentioned, "refer to the principles of the ordinance according to which the constitution was to be formed, its provisions could not control the authority and power of the State after her admission. Whatever the limitation upon her powers as a government was whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted, after she became a State of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States." *Permoli* v. *First Municipality of New Orleans*, 44 U. S. (3 How.) 588; *Pollard* v. *Hagan*, 3 How. 212; *Van-Brocklin* v. *Tennessee*, 117 U. S. 151; *Huse* v. *Gardner*, 119 id. 544; *State* v. *Cunningham*, 81 Wis. 440, Op. PINNEY, J.; *Strader* v. *Graham*, 10 How. 82; 3 Am. & Eng. Ency. of Law, 671, note, and cases cited.

In *Illinois River Packet Co.* v. *Peoria Bridge Co.* 38 Ill. 478, Mr. Justice BREESE said that it was "unnecessary to decide the question whether this ordinance is in force or not," but it was held that, even if admitted to be in force, it was not, in the matter there complained of, violated. In *Phœbe* v. *Jay*, 1 Breese, 268, decided in 1828, it was said that the ordinance was "no doubt still binding upon the people of this State, unless abrogated by common consent," but it was held that the admission of the State into the Union, by act of Congress, abrogated, or gave

consent to the abrogation, of so much of the ordinance as was in conflict with the State constitution.

If it could be successfully contended that the ordinance of 1787 secured for all time that equality in representation contended for, then the provision of the constitution which provides that a county containing 131,000 inhabitants shall be entitled to but one senator and three representatives, while another county containing but 61,000 may be entitled to the same representation, would be itself invalid, as repugnant to that ordinance. But no one contends that the constitution can be invalid for any such reason, so long as it does not contravene any provision of the constitution of the United States. We are not at liberty, nor are we disposed, to go outside of the constitution, nor, keeping within its bounds, to trespass upon the legislative field, and set up some standard of our own, based upon what might be deemed the inalienable rights of men, or the fundamental principles of right and justice, or of republican government, or some principle supposed to underlie the constitution, by which to measure the validity of this act of the legislature. (Cooley's Const. Lim. 197, 200, 204; *Cochran* v. *Van Surlay*, 20 Wend. 365; *Wynehamer* v. *People*, 13 N. Y. 378; *Porter* v. *Railroad Co.* 76 Ill. 561.) We do not, however, mean to imply that counsel contend we have any such power.

That there are many constitutional duties imposed upon other departments of the government which cannot be enforced by the courts, and the manner of compliance with which is left to the sole and final determination of the department upon which the duty is imposed, will not be denied. The provision relating to senatorial apportionment required the legislature to apportion the State in 1871 and every ten years thereafter. But the first act was not passed until 1872 and the last in 1893, but it is not contended that these statutes are unconstitutional because not passed within the years prescribed. The constitution of the State of New York contained similar

provisions, and the Court of Appeals held that an appor-
tionment act was not invalid because passed some years
later than the prescribed time, but that the constitution
was so far mandatory as to make the duty a continuing
one, which, upon failure of one legislature to discharge
it, was cast upon its successor. (*Rumsey* v. *People*, 19
N. Y. 41; *People* v. *Rice*, 135 id. 473.) Nor have the courts
any power to compel the legislature to act in any case,
however imperatively the duty may be imposed upon
that body to act, so that if the legislature should wholly
neglect or refuse to pass an apportionment act after the
lapse of ten years, and should leave in force an act under
which the districts had become grossly unequal in pop-
ulation, the people would have no remedy, outside of
a constitutional amendment, except to elect a General
Assembly which would perform the duty. *Giddings* v.
*Blacker*, 93 Mich. 1; *People ex rel.* v. *Bissell*, 19 Ill. 229 ; *Peo-
ple ex rel.* v. *Cullom*, 100 id. 472 ; *Myers* v. *English*, 9 Cal. 341.

Section 22 of article 4 prohibits the General Assembly
from passing any local or special laws in any of twenty-
three enumerated cases, and then provides that "in all
other cases where a general law can be made applicable
no special law can be enacted ;" and it is decided by this
court that the question whether or not a general law can
be made to apply in a case not falling within those spe-
cifically enumerated is addressed to the legislature, and
not to the courts, and that its decision in that respect,
involved in the passage of the act, is final, and the courts
have no power to revise, reverse or annul it. (*Owners of
Lands* v. *People*, 113 Ill. 296; *People* v. *Harper*, 91 id. 357;
*Johnson* v. *Joliet and Chicago Railroad Co.* 23 id. 124.) Again,
section 12 of article 5 provides that "the Governor shall
have power to remove any officer whom he may appoint,
in case of incompetency," etc., and it is decided that,
this power being vested in the Governor, he alone has
the power to determine the question of incompetency,
and may make such determination from the best light he

can get, "and that it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision." *Wilcox* v. *People*, 90 Ill. 186; *People ex rel.* v. *Cullom*, 100 id. 472; *People ex rel.* v. *Bissell*, 19 id. 229.

Many other instances might be cited, were it necessary, where the decision of the other departments of the State government are not subject to reversal by the courts. Full power and final authority to perform the different governmental functions must be lodged somewhere, and it is the duty of all public functionaries to respect the disposition of the several powers of government as made by the constitution. It would be a new doctrine, and one fraught with much danger, to hold that the courts may reverse or annul acts of the other departments in matters committed by the constitution to the judgment and determination of such other departments, or in matters where it is a question of serious doubt whether they are so committed or not, even although the courts might be satisfied that in the determination of the question by the department to which it is committed the constitution has not been properly observed. The only remedy for dereliction of duty in such cases lies in the frequency of elections, by which the people may choose others to serve them, and in the impeachment and removal from office of those made subject to that punishment. This view does not deny the jurisdiction of the court to pass upon the constitutionality of a statute making a senatorial apportionment, to the same extent as in other cases, but it does deny the power of the court to follow the statute any further than the boundary line enclosing the discretionary power of the legislature, and to invade that discretion, in any case.

It was not discretionary with the legislature whether it would, or not, comply with the four restrictions before mentioned, upon its power, respecting the observance of county lines, the division of counties, the minimum

number of inhabitants necessary to form a district, and the contiguity of territory in forming districts. Nor was it discretionary as to whether or not that body would, subject to said limitations, apply the principles of compactness of territory and approximate equality in population in making the apportionment; but we do hold that it was a question for its final determination as to what approximation could or should be made toward perfect compactness of territory and equality in population,— and this, too, though treating this requirement of the constitution as mandatory on the legislature. In other words, if it clearly appeared that in the formation of any district the requirement of compactness of territory and equality in population had been wholly ignored, had not been considered or applied at all, to any extent, then the statute would be clearly unconstitutional. But if it has been considered and applied, though to a limited extent only, subject to the other more definitely expressed limitations, then the General Assembly has not transcended its power, although it may have very imperfectly performed its duty, and the act is valid. That no department of the State government has any discretion as to whether or not it will perform a constitutional duty, and that constitutional provisions are to be treated as mandatory rather than as directory, do not militate against the position here assumed, for however peremptorily the performance of the duty may be enjoined by the constitution, it cannot be enforced, or the manner of its performance be revised, by the courts, in a matter committed by the constitution to the final decision of such department. (Cooley's Const. Lim. 78-83.) The same eminent authority above quoted from says: "Where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the constitution imposes, and not those implied restrictions which, resting in theory, only, the people have been satis-

.fied to leave to the judgment, patriotism and sense of jus-
tice of their representatives." Cooley's Const. Lim. 129.

It is the duty of the court, in the decision of this case,
to determine what is meant by "compact territory," as
used in the constitution. It was suggested in the argu-
ment, that, as used in its application to the formation of
districts, it means that no district shall be so formed as
to surround another district, one being circular in form
and hollow, containing another within; that such a dis-
trict would not be compact. But we cannot say that the
words "compact territory" were used only in that sense,
or with the intention of preventing the formation of such
districts, only. It is not shown in any way that districts
had been previously so formed, and that it had become
an evil which it was the apparent purpose of the consti-
tution to remedy. The word "compact" has different
meanings, as given by standard lexicographers, accord-
ing to the subject in connection with which it is used.
It is defined as meaning, "closely and firmly united, as
the parts or particles of solid bodies; having the parts
or particles pressed or packed together;" "close;" "solid;"
"dense;" "as, a compact mass of people." Counsel for ap-
pellants contend that, so far as it can be applied to mere
territorial surface, it means "dense"—"pressed together;"
and they say: "The districts are to be so formed that
the territory shall be 'pressed together'—close—near to
a common center; in no way so well expressed as by the
word 'compact.'" Not much fault can be found with this
contention, but we are of the opinion that as used in the
constitution, and applicable to mere territorial surface,
the word "compact" means "closely united," and that the
provision that districts shall be formed of contiguous
and compact territory means that the counties, or sub-
divisions of counties, (when counties may be divided,)
when combined to form a district, must not only touch
each other, but must be closely united, territorially.
The requirement of contiguousness was contained in the

constitution of 1848, and it was evidently the intention of the people, in adding the requirement of compactness in the constitution of 1870, to guard, as far as practicable, under the system of representation adopted, against a legislative evil commonly known as the "gerrymander," and to require the legislature to form districts, not only of contiguous, but of compact or closely united, territory.

After all authorities are consulted and definitions considered, the words used in the constitution are about as definite in meaning and as easily understood as any that could have been adopted to express the same idea. The only negative clause used in the same connection is with reference to population, as follows: "but no district shall contain less than the senatorial ratio." When the irregularities in the size and boundaries of the counties are considered, together with other obstacles which would necessarily be encountered in subdividing territory, it is apparent that anything like close approximation to perfect compactness of territory, in the sense of equal nearness of its parts to a common center, could not have been meant. The most compact district, territorially, would be a circular plane, all points on the boundary of which would be equi-distant from the center. Next would come the square, and it was said in argument that as straight lines are used in all surveys, divisions and subdivisions of territory, districts in the shape of squares and rectangles would most nearly meet the requirement of the constitution. It was not, however, and could not reasonably be, contended that any such rule could have been applied, at least outside of Cook county.

The provision requiring compactness of territory, subject, as it must be, to other more definitely expressed rules, may also, in application, be modified by the requirement of equality in population. It was said by the Supreme Court of Wisconsin in a recent case, (*State* v. *Cunningham*, 83 Wis. 151,) that "compactness, being of less importance, may to some extent yield in aid of securing

a nearer approach to equality of representation." While
it is not necessary, if within our province, to determine
which of these two requirements should yield to the other,
yet it is plain that in application each must, to some ex-
tent, affect the other. Who, then, must finally determine
whether or not a district is as compact as it could or
should have been made? Surely not the courts, for this
would take from the legislature all discretion in the.
matter and vest it in the courts, where it does not belong;
and no apportionment could stand· unless the districts
should prove as compact as the judges might think they
ought to be or as they could themselves make them.
As the courts cannot make a senatorial apportionment
directly, neither can they do so indirectly. There is a
vast difference between determining whether the prin-
ciple of compactness of territory has been applied at all
or not, and whether or not the nearest practical approx-
imation to perfect compactness has been attained. The
first is a question which the courts may finally determine;
the latter is for the legislature. These views are in ac-
cord with *State* v. *Campbell,* 48 Ohio St. 435, *People* v. *Rice,*
135 N.Y. 473, *People* v. *Board of Supervisors,* 136 id. 281, and
*In re Baird,* 37 N. E. Rep. (N. Y.) 619.

Some room, it must, in reason, be admitted, is left by
the constitution for the exercise of the legislative judg-
ment in determining how near an approximation to per-
fect compactness of territory and equality in population
can be made, and it must also be admitted that the scope
within which the judgment of the legislature may be ex-
ercised without being subject to the supervision of the
courts must be determined by the language of the con-
stitution and the application of sound legal principles,
and not by the mere arbitrary opinion of judges. Would
it not be mere arbitrary opinion for this court to say
that the statute is void because, although no district, as
formed, contains less than four-fifths of the ratio, but
several thousand more, yet some districts should have

contained still more and others less to more nearly ap-
proximate equality? How many more, or how many less?
Or because some districts might have been made more
compact? How much more? Who shall draw the defi-
nite line across this legislative field, where none is drawn
by the constitution? And where shall it be drawn? How
can the courts lay down any rule founded on legal prin-
ciples, and not on mere arbitrary opinion, by which it
can be determined how near, above the minimum of four-
fifths, the legislature must approach the ratio of 75,026
to make the apportionment valid? The rule of mathe-
matical approximation requiring the nearest approach
to equality mathematically possible, could not, of course,
be applied and at the same time the other constitutional
requirements be obeyed, as before pointed out. Such a
rule might possibly be adopted where, as in some of the
States, each county is allowed one member of the assem-
bly, and the surplus of members is apportioned to the
counties having the largest fractions of representative
population. But that is not the method contemplated
by the constitution of this State. And in New York,
where that method is provided for in the constitution, a
legislative apportionment was held valid by the Court
of Appeals, as within the legislative discretion, which,
after giving one member to each county, apportioned the
remaining members, not to the counties having the great-
est number of inhabitants, but in several instances pass-
ing them by and giving the member to less populous
counties, resulting, in some instances, in a large and
populous county having three representatives and a less
populous one having four. *People* v. *Rice*, 135 N. Y. 474.

The apportionment as made by the act of 1893 does
not make the districts vary as much in population as from
a fifth below to a fifth above the ratio. Here is a wide
latitude, in a populous State, for inequality, it must be
admitted; and we do not mean to say that the legisla-
ture could have arbitrarily formed a district containing

simply the constitutional minimum of four-fifths, and another district adjoining with one-fifth or more above the ratio, when, by taking a county from the larger and adding it to the smaller district, greater equality in population and compactness of territory could have been secured, for in such case it might perhaps be said that the principles of compactness of territory and approximate equality in population, above the minimum, had been disregarded and not applied at all by the legislature. But no opinion is expressed as to whether such an apportionment would be valid or not, for by the statute in question the lowest number of inhabitants in any district is, in round numbers, 62,000, which is an approach toward the ratio, (75,026, the standard of equality,) of 2000 above the minimum of four-fifths of the ratio. It is therefore seen that the legislature did have in view, and did apply, to some extent, the principle of approximate equality in population above the minimum fixed by the constitution,—not the nearest approximation, it is true; and it might well have been contended in the legislative body itself, having the power to determine the question, that justice and equality in representation, as contemplated by the constitution, required a much closer approximation.

It follows, also, that it cannot be said that the legislature wholly failed to have in view and apply the principle of compactness of territory. No district, unless a circle or a square, could be so compact that it could not be made more so. Nor can it be said, we think, that this construction gives to the phrase "contiguous and compact territory," as used in the constitution of 1870, no more force than the phrase "contiguous territory," as used in the constitution of 1848. The territory forming the districts under the act of 1893 is not contiguous, merely, but is, to some degree, compact. Doubtless a district could be formed of counties so "strung out," and barely touching, as to make the territory contiguous but

not compact in any sense, but we cannot see that such a district has been formed.

We have been referred to several cases recently decided, respectively, by the Supreme Courts of Indiana, Wisconsin and Michigan, holding certain apportionment statutes of those States unconstitutional, as being here in point: *Parker* v. *State*, 133 Ind. 178; *State* v. *Cunningham*, 81 Wis. 440; *Same* v. *Same*, 83 id. 90; *Board of Supervisors* v. *Secretary of State*, 92 Mich. 638; *Giddings* v. *Blacker*, 93 id. 1. See, also, *People* v. *Rice*, 135 N. Y. 474; *People* v. *Board of Supervisors*, 136 id. 281; *In re Baird*, (N. Y.) 37 N. E. Rep. 619. The constitutional provisions of the States mentioned, relating to this subject, are somewhat similar to, but not identical with, our own. They contain provisions designed to secure practical equality in representation, but no minimum number of inhabitants is fixed as necessary to be contained in a district, nor is there, except in Wisconsin, any requirement of compactness of territory. The Indiana constitution provides that the senators and representatives shall be apportioned among the several counties according to the number of male inhabitants above the age of twenty-one years, and that a senatorial or representative district, where more than one county shall constitute a district, shall be composed of contiguous counties, and that no county, for senatorial apportionment, shall be divided. The statute held unconstitutional by the Supreme Court of that State put the same county, in several instances, in two different districts, so as to connect counties in the same district otherwise separated, and apparently in order to comply with the requirement of contiguity of counties, thus evading that provision of the constitution and giving these counties double representation. There were also greater differences in population between districts than between those formed by the statute of this State. The court very properly held, that when a county had once been used in forming a district it ceased to be a factor in the

formation of other districts. The constitution of Wisconsin requires the apportionment to be according to county, town or ward lines, the districts to consist of contiguous territory, and to be in as compact form as practicable. The legislature paid no attention to county lines, in many instances, in the apportionment made, but dismembered the counties, and in some instances gave two members to one county and only one to another county having a greater population. The Supreme Court, holding the act void, said : "In the act under consideration there are twenty instances in which counties have been divided in the formation of assembly districts, in violation of the constitutional rule preserving the territorial integrity of counties in the apportionment of the State into assembly districts, and by no possible construction of the act can it be brought into harmony with the provisions of the constitution. Both the provisions of the constitution and of the act are too plain for construction, and the repugnance of the act to the constitution is clear and irreconcilable. The rule in respect to contemporaneous construction is inapplicable, for no amount of usage will suffice to dispense with or overcome a plain statutory provision, much less a plain provision of the constitution." Thereafter, in July, 1892, the legislature of Wisconsin passed another apportionment act, which was the same year declared unconstitutional also by the court, for the reason, principally, that the apportionment was not made "according to the number of inhabitants," the greatest difference being, where one senate district contained 80,732 and another 65,952. The statute of Michigan held unconstitutional by the Supreme Court of that State organized districts, the one having the greatest population containing 97,330 and the one having the least, 39,727. It would seem plain that in the instances mentioned in the Wisconsin and Michigan cases there was no approximation toward equality in representation, for where one district contained, in the one case,

more than twice, and in the other nearly three times, the population of another district, the legislature could not at all, in those instances at least, have regarded the injunction of the constitution to make the apportionment "according to the number of inhabitants."

While we might well agree with the conclusions reached in these several cases decided in the three States last mentioned, we cannot, however, endorse, or at least regard as applicable to this case, all that was said in the several opinions rendered.   As much as the disposition of the legislative majority to obtain an undue partisan advantage by senatorial apportionments, at the expense of equality in representation, is to be deprecated, the evil cannot be remedied by the courts so long as the power to commit it is left in the body on which the duty to make the apportionment is imposed.   The legislature has exercised this power ever since the adoption of the present constitution, and if it were a question, upon legal principles and decided cases, left gravely doubtful whether the act of 1893 could be by the courts held unconstitutional or not, the contemporaneous construction by the legislature, acquiesced in by the other departments and by the people for nearly a quarter of a century, would be entitled to great weight in sustaining the validity of the statute.   (Cooley's Const. Lim. 82; *Cohens* v. *Virginia*, 6 Wheat. 264; *Bank of United States* v. *Halsted*, 10 id. 51; *State* v. *Choat*, 11 Ohio, 515; *Field* v. *People*, 2 Scam. 79; *State* v. *Mayhew*, 2 Gill, 467; *People* v. *Supervisors*, 100 Ill. 495.)   In imposing this duty on so numerous a body as the General Assembly, the people must be presumed to have contemplated that the two houses, composed of men from all parts of a great State, representing different and often conflicting interests and views, would have much difficulty in securing perfectly fair results, and that only an approximation, within the limits fixed in the constitution, toward absolute equality in representation or compactness of territory could be secured.   The definite

limitations fixed by the constitution show an intention to circumscribe the legislative discretion, but not to take it away altogether.

For the reasons stated, the statute of 1893 in question must be held to be within the power of the General Assembly to enact, and finding no error in the record the judgment of the circuit court is affirmed.

*Judgment affirmed.*