(No. 72662.—

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* ROLAND BURRIS *et al.*, Plaintiffs, v. GEORGE H. RYAN *et al.*, Defendants.

*Opinions filed December 13, 1991, and January 14, 1992.*

Opinion filed December 13, 1991
MILLER, C.J., joined by MORAN, J., dissenting.

Opinion filed January 14, 1992
MILLER, C.J., and HEIPLE, J., concurring.
CLARK, J., joined by FREEMAN, J., dissenting.
BILANDIC, J., joined by CLARK and FREEMAN, JJ., dissenting.

Roland W. Burris, Attorney General, of Springfield (Thomas R. Dodegge, James R. Carroll, Roger P. Flahaven and Michael Daniels, Assistant Attorneys General, of Chicago, of counsel), for plaintiffs.

William J. Harte, Robert L. Tucker, Joseph E. Tighe, Stephen L. Garcia, Courtney C. Nottage, Herman G. Bo-

dewes and James H. Donnewald, all of Chicago, for intervenor-plaintiffs Joseph Gardner *et al.*

Gary A. Weintraub, David A. Epstein and Les S. Kuczynski, all of Chicago, for intervenor-plaintiffs Thaddeus S. Lechowicz *et al.*

Schaefer, Rosenwein & Fleming, of Chicago (Martha A. Mills, of counsel), for intervenor-plaintiffs Rebecca W. Owens *et al.*

Kevin M. Forde and Janice R. Forde, of Kevin M. Forde, Ltd., and James M. Scanlon, all of Chicago, for intervenor-plaintiffs Beverly Area Planning Association *et al.*

Matthew J. Piers, Jonathan A. Rothstein and Carol L. Nealy, of Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., of Chicago, for intervenor-plaintiff Miguel del Valle.

William H. Mansker, of Mansker & Shanahan, James D. Montgomery and Jean M. Templeton, of James D. Montgomery & Associates, Ltd., and Robert Anderson, all of Chicago, for intervenor-plaintiffs Task Force for Black Political Empowerment *et al.*

Jeffrey D. Colman, Thomas S. O'Neill and Janice A. Hornaday, of Jenner & Block, and Linda Yanez and Arturo Jauregui, all of Chicago, for intervenor-plaintiffs Henry Martinez *et al.*

Dan K. Webb, Steven F. Molo, Timothy J. Rooney and Thomas V. Skinner, of Winston & Strawn, of Chicago, special State counsel for defendants George H. Ryan, Illinois Secretary of State, and the Illinois Legislative Redistricting Commission.

A.L. Zimmer and V. James Tenuto, of Chicago, special State counsel for defendant Illinois State Board of Elections.

Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., of Chicago (Marvin Gittler and Joel A. D'Alba, of counsel), for *amicus curiae* Illinois State Federation of Labor.

Tyrone C. Fahner, Richard S. Williamson, George J. Tzanetopoulos and Lori E. Lightfoot, of Mayer, Brown and Platt, and Charles F. Marino and David M. Marino, all of Chicago, for *amici curiae* Congressmen Dennis J. Hastert *et al.*

*Opinion filed December 13, 1991.*

JUSTICE CUNNINGHAM delivered the opinion of the court:

The plaintiffs, the People of the State of Illinois *ex rel.* Burris *et al.*, appeal the adoption of the statewide plan of redistricting approved by the Illinois Redistricting Commission (Commission), which was filed with the Secretary of State on October 4, 1991. This court has original and exclusive jurisdiction over this matter pursuant to article IV, section 3, of the Illinois Constitution of 1970.

The facts are as follows. Pursuant to article IV, section 3(b), of the Illinois Constitution of 1970, the Illinois General Assembly was required to redistrict the legislative and representative districts throughout the State because of the Federal decennial census. The new districts must be compact, contiguous and substantially equal in population, as required in article IV, section 3(b), of the Illinois Constitution of 1970.

On June 30, 1991, both houses of the Illinois General Assembly passed a redistricting plan, House Bill 1354, as amended. Governor Jim Edgar vetoed amended House

Bill 1354. As a result of the veto, article IV, section 3, of the Illinois Constitution of 1970 provided for the formulation of the Illinois Legislative Redistricting Commission. The Commission was to develop and approve a redistricting plan by August 10, 1991.

The Commission was formed on July 10, 1991. The first meeting of the Commission was scheduled for and occurred on July 17, 1991. At the first meeting, the Commission elected its chairman and vice-chairman as well as adopted its rules of procedure. The Commission also unanimously consented to receive and incorporate the legislative record relating to the redistricting, House Bill 1354, as amended, into its record.

On July 29, 1991, the Commission conducted two hearings, one in Chicago and the other in Springfield. At each hearing, four commissioners were in attendance at each site, two commissioners affiliated with the Democratic party and two commissioners affiliated with the Republican party. At both hearing sites, the Commission heard public testimony.

At the next meeting, on August 8, 1991, the full Commission met in Springfield and heard public testimony. At the next meeting, on August 10, 1991, in Springfield, certain commissioners formally presented to the Commission the redistricting plan of House Bill 1354, as amended (Plan I). However, Plan I failed to receive the affirmative vote of the Commission. At the conclusion of the August 10 meeting, the Commission failed to file a plan approved by five members.

Because the Commission failed to approve a redistricting plan, article IV, section 3(b), directed that this court submit the names of two persons, not of the same political party, to the Secretary of State no later than September 1. This court submitted the names of Albert R. Jourdan, chairman of the Republican party of Illinois,

and Daniel P. Ward, retired Justice of the Supreme Court of Illinois, only one of whom was to be selected.

At the next meeting of the Commission, September 5, 1991, the Secretary of State drew the name of the ninth member of the Commission, Albert R. Jourdan. Following the September 5 meeting, the chairman requested a meeting to be held on September 23, 1991. However, at that requested meeting, only a total of four commissioners were in attendance.

At that time, the chairman recognized the lack of a quorum. The meeting was then set to reconvene September 25, 1991. Defendant Secretary of State states that at the request of the chairman, no meeting notice for the September 25 meeting was issued in compliance with rules, no meeting was scheduled in compliance with the rules, and no meeting was held in compliance with the rules. Therefore, the transcript of the September 23 meeting is not an official Commission document.

The nine-member Commission met for the first time on September 25, 1991. It was at this meeting that the Commission amended the rules to allow for the election of a new chairman. The ninth member, Albert R. Jourdan, was elected as the new chairman. The former chairman was elected as vice-chairman. After the election, the Commission heard public testimony regarding the redistricting process. The Commission also heard testimony regarding certain Commission members' holding extra-Commission meetings with individuals and groups. The testimony concerned the makeup of each district, especially the percentages to be used for racial or ethnic makeup of certain districts.

The new chairman stated, in part:

"It is the desire of the Chairman to accept proposed maps for publication on Tuesday, October 1, 1991. These will be shared with the press and public immediately upon filing. The Commission will then accept written

comments on all proposed maps until 12:00 noon on Thursday, October 3, 1991 \*\*\*. It is my intention to call another meeting for 9:00 a.m. on Friday, October 4, 1991, in the State Capitol in Springfield. At that time, further oral comments on published maps will be received in the same manner we are receiving comments today."

At the next meeting, on October 1, 1991, chairman Jourdan submitted a statewide redistricting plan called "The Jourdan Plan" (Jourdan I Plan). The chairman announced that written comments could be filed regarding Plan I and the Jourdan I Plan by noon October 3, 1991. After testimony of only one witness, the Commission adjourned until Friday, October 4, 1991.

Although the rules adopted July 17, 1991, provided that all redistricting plans were to be accompanied by a computer diskette in the ASCII format encoded in a 13-character designation code, the Jourdan I Plan was not in compliance with the rules. As such, the Jourdan I Plan was not submitted to the Democratic members of the Commission for proper and expeditious analysis.

On October 3, 1991, the Democratic appointees to the Commission submitted an amendment to Plan I, the "Cousin Plan." Also on October 3, 1991, numerous written comments from the public were submitted in response to the Jourdan I Plan. The Commission still had an additional day in which to consider public testimony, proposed amendments or revisions to the plans, and to deliberate collectively on the merits of the redistricting plans. An amendment to the Jourdan I Plan, the Jourdan II Plan, was submitted on the morning of October 4, 1991.

At the final meeting, October 4, 1991, the Commission heard public testimony from 36 individuals on their own behalf or on behalf of certain groups against the implementation of the Jourdan I Plan.

However, at the final meeting, the clerk of the Commission announced that an amendment to the Jourdan I Plan had been submitted to the Commission by the chairman that very morning. A Democratic commissioner pointed out that no Democratic member had seen it or received a copy of the computer diskette. The chairman announced that it was not required by the rules, but that the diskette would be available. At that point, the chairman moved for public testimony.

The witnesses gave testimony regarding the Jourdan I Plan. At the end of the public testimony and a short adjournment, commissioner Cousin moved for leave to amend Plan I with the Cousin amendment, but by a 5-4 vote, the Commission denied the motion. After the defeat of the Cousin amendment, a Republican commissioner then moved for leave to amend the Jourdan I Plan and for consideration of the amended plan (Jourdan II Plan). The chairman refused three times to permit questions regarding the Jourdan II Plan. Again, a Democratic commissioner stated that he did not know what the amendment to the Jourdan I Plan accomplished. After the chairman called for a roll call, the Commission adopted the amendment by a 5-4 vote.

Thereafter, commissioner Churchill moved to approve the Jourdan II Plan. The Democratic commissioners made inquiries regarding what the Jourdan II Plan accomplished. The answer by the Republican commissioners to the question was that the "map in that part of the state complies with both the Illinois and Federal Constitutions and is politically fair and meets the requirements of the Federal Voting Rights Act."

Eventually, a motion was made to adopt the Jourdan II Plan. It was adopted by a 5-4 vote. The Jourdan II Plan was filed with the Secretary of State on October 4, 1991. Following the adoption of the Jourdan II map, the Commission, by resolution, directed the State Board of

Elections to commence the preparation of legal descriptions of the representative and legislative districts. The Commission, also by resolution, authorized the firm of Winston & Strawn to file an action seeking "a declaratory judgment that the approved redistricting plan is in compliance with applicable State and Federal laws." The Commission then adjourned.

Subsequently, on October 11, 1991, the Attorney General of Illinois, Roland W. Burris (plaintiff), filed a motion with this court, pursuant to Supreme Court Rule 382 (134 Ill. 2d R. 382), seeking leave to file a complaint challenging the Jourdan II Plan.

This court granted the motion of the plaintiff and motion of Gardner and Martinez to intervene. On November 6, 1991, this court granted several additional parties leave to intervene, *i.e.*, Owens, Lechowicz, the Beverly Area Planning Association, del Valle, and the Task Force for Black Political Empowerment.

Defendant Secretary of State answered each complaint and filed a motion to dismiss each complaint for failure to join the Commission as a necessary party and for failure to state a cause of action.

In section 3 of article IV of the Illinois Constitution, it is provided that the legislative and representative "[d]istricts shall be compact, contiguous, and substantially equal in population." (Ill. Const. 1970, art. IV, §3(a).) In defining those requirements, this court over the years has emphasized that a redistricting plan must not dilute minority voting strength, must not accomplish political gerrymandering and must keep communities of interest.

Although this court will look for guidance and inspiration from the Federal court in interpreting our State constitution, we make the final determination. (*Rollins v. Ellwood* (1990), 141 Ill. 2d 244, 275.) In line with that holding, we do not adopt the recent opinion of the Fed-

eral court in *Hastert v. State Board of Elections* (N.D. Ill. 1991), 777 F. Supp. 634. We first note that the *Hastert* court did not have before it any plan approved by the constitutionally mandated Commission and, as such, its findings have no bearing on this cause. Second, the issue before the *Hastert* court was to "determin[e] which of the two proposed plans best meets the goals and criteria, both constitutional and non-constitutional, enumerated by the [United States] Supreme Court." (*Hastert*, 777 F. Supp. at 640.) Neither plan was generated or approved by the Commission. It is the detailed analysis of the constitutional requirement for approval of a redistricting plan which we find of significance.

The *Hastert* court did reiterate an important consideration of all parties:

> " 'The very essence of districting is to produce a different—a "more politically fair"—result. *** Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of the districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. *** Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.' " (*Hastert*, 777 F. Supp. at 659, quoting *Gaffney v. Cummings* (1973), 412 U.S. 735, 753, 37 L. Ed. 2d 298, 312, 93 S. Ct. 2321, 2331.)

This court also recognizes that historically municipalities, villages, townships, cities and counties may have to be divided in order to achieve the Illinois constitutional re-

quirements, but more importantly to meet the controlling consideration of "one man-one vote." *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 167.

The initial concern is drawing a district map which is compact. This court has stated, "[C]ompactness, while an end to be sought in the redistricting process, is clearly subservient to the dominant requirement of equality of population among legislative districts." (*Grivetti*, 50 Ill. 2d at 166.) Statistics do not necessarily reveal compactness. (*Schrage v. State Board of Elections* (1981), 88 Ill. 2d 87, 98.) On the other hand, boundary lines of villages, townships, counties and cities do not necessarily reveal communities of interests. Unlike the Ohio Constitution, which believes such lines do, our legislature has recognized the difficulty in drawing district lines by following established boundary lines. (See *Armour v. Ohio* (6th Cir. 1991), 925 F.2d 987; *People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 461, 477.) The consensus of this court is that the districts must be reasonably compact and not necessarily perfect. *Grivetti*, 50 Ill. 2d at 166; *Thompson*, 155 Ill. at 478; *Schrage*, 88 Ill. 2d at 95.

In *Thompson*, the court defined compact as "closely united." (*Thompson*, 155 Ill. at 478.) "In fact, compactness is 'almost universally recognized' as an appropriate anti-gerrymandering standard." (*Schrage*, 88 Ill. 2d at 96; *Thompson*, 155 Ill. at 479.) In sum, compactness is a constitutional requirement in Illinois which cannot be ignored in redistricting. *Schrage*, 88 Ill. 2d at 96.

Contiguousness was defined by this court in *Western National Bank v. Village of Kildeer* (1960), 19 Ill. 2d 342, 352, as follows:

> " 'Contiguity' means 'in actual contact; touching or adjoining.' *** [I]n order to be considered contiguous within the meaning of the statute, the tracts of land in the territory must touch or adjoin one another in a reasonably

substantial physical sense. However, the line of demarcation between the reasonableness and unreasonableness of the contiguity cannot be drawn with precision and must be determined from the facts of each case when viewed in the light of such concept."

In *Schrage*, this court thoroughly examined the requirement of substantially equal and stated:

"The Illinois Constitution of 1970 requires that all legislative districts be 'substantially equal in population.' (Ill. Const. 1970, art. IV, §3(a).) An interpretation of the 'substantially equal in population' standard is contained in the 1970 constitutional convention legislative committee's explanation on the proposed standards for redistricting. The committee stated:

'Recognizing that equality of population is the primary criterion for redistricting, the Legislative Committee decided to place the flexible phrase, "substantially equal in population" in the sub-section on standards. The degree of flexibility of this phrase will clearly be determined by the courts. The Legislative Committee believes it is important to recognize the "equality of population" criterion in a way which will allow redistricting in Illinois to accord with the prevailing Supreme Court decisions on this subject. Should the Supreme Court ever relax the "one man, one vote" standard, Illinois would not be precluded from creating districts within more flexible population limitations imposed by the courts.' [Citation.]

*** It is thus clear that the requirement that legislative districts be 'substantially equal in population' is coextensive with the Federal requirement of 'one man, one vote' and that this constitutional standard is flexible and is to be interpreted in accordance with the prevailing United States Supreme Court decisions." *Schrage*, 88 Ill. 2d at 100-01.

Upon review, the duty of this court is to determine whether the principle of compactness of territory has been applied. (*Thompson*, 155 Ill. at 480.) In addition, section 3(b) of article IV of the Illinois Constitution pro-

vides that "[a]n approved redistricting plan filed with the Secretary of State shall be presumed valid, [and] shall have the force and effect of law." (Ill. Const. 1970, art. IV, §3(b).) "[W]here there is any reasonable doubt as to whether a statute is constitutional or not, the courts will incline in favor of the law, and hold it valid." (*Thompson*, 155 Ill. at 464.) However, this court held in *Grivetti* that any process which is "so completely at variance with the constitutional mandate" precludes this court from "recognizing as valid a product formulated by [such] means." (*Grivetti*, 50 Ill. 2d at 165.) Although this court made that conclusion in *Grivetti* regarding the provision regarding the self-appointment of legislative leaders to the redistricting Commission, we find it applicable in this cause.

In this case, the parties have presented insufficient facts for this court to ascertain with certainty whether the district lines meet legal guidelines. Accordingly, we must remand the matter to the Commission for further proceedings.

It is well established that this court is a court of review which has jurisdiction over issues of law. We will not assume jurisdiction of an original action if the pleadings present issues of fact. (*Monroe v. Collins* (1946), 393 Ill. 553, 557; *People ex rel. Jones v. Robinson* (1951), 409 Ill. 553, 555.) Unlike the *Hastert* court, this court does not have data with which to review because the Commission did not hold a hearing on the approved map. The *Hastert* court had census data, deviation statistics, and expert testimony. This court has only allegations and affidavits.

Furthermore, both sides have been granted over a million dollars to submit a plan, or plans, or amendment to a plan, as well as the opportunity to provide for public scrutiny and hearing. Since both sides submitted plans and amendments on the last two days, thereby thwart-

ing any type of hearing, whether for expert testimony or public criticism, we cannot in good conscience approve or disapprove any plan no matter how fair, compact or contiguous and substantially equal the districts have been formed. This court finds that to do otherwise would circumvent the spirit and purpose of the Illinois Constitution.

Even though this court does not reach the issue regarding the constitutional validity of the plan as a whole, we do find certain districts do not appear to meet the constitutionally mandated requirements. (*Schrage*, 88 Ill. 2d at 98.) We have enumerated these districts with the questions to be addressed at the hearing:

1. Compactness:

Do the following districts violate article IV of the Illinois Constitution of 1970, which provides that all districts be drawn in a compact and contiguous manner? Is there a justifiable, neutral reason for any of the below configurations?

| Senatorial District | House District |
| --- | --- |
| 7 | 14 |
| 10 | 19 |
| 11 | 21 |
| 18 | |
| 24 | 47 |
| 34 | |
| 37 | 73 |
| 38 | 75 |
| 53 | |
| 54 | |

2. Compactness and Racial Dilution:

Do the following districts violate article IV, section 3, of the Illinois Constitution of 1970, which provides that all districts be drawn in a compact and contiguous manner? Do the following districts violate

article III, section 3, of the Illinois Constitution of 1970, which provides that all elections be free and equal? Is there a justifiable, neutral reason for any of the below configurations?

Senatorial District
6
36
44
51
52
56
57

3. Racial Dilution:

Do the following districts violate article III, section 3, of the Illinois Constitution, which provides that all elections be free and equal?

| Senatorial District | House District |
| --- | --- |
| 21 | 5 and 6 |
| 29 | 8 |
| 33 | 10 |
| 39 | 25 and 26 |
| 42 | 27 and 28 |
| 43 | 32 |
| 50 | 59 |
| | 61 and 62 |

The Commission is not precluded or limited to considering other Senatorial or House districts in addition to those listed above.

This court finds that the well-researched *Hastert* opinion should be seriously reviewed by the Commission and each party as they submit a plan, data and testimony. These guidelines will be followed by this court as it reviews any plan or plans approved and submitted by the Commission to this court. If the Commission follows these guidelines, we will then have the necessary evi-

dence with which to adequately review and issue a final decision in this matter.

We remand this cause to the Commission with the following directions. The Gardner intervenors, the Attorney General and other intervenors jointly, and the five commissioners of the Legislative Redistricting Commission who supported the Jourdan II Plan, and the other defendants jointly, are each given leave to file within seven days from December 20, 1991, a modified statewide plan of reapportionment considering the districts listed above, and making any changes thereby required or incidental thereto. Each plan submitted shall be accompanied by:

    (a) a map;

    (b) census geography description;

    (c) statistical summaries of minority population and voting age population;

    (d) exchangeable computer diskette for the court and all parties.

These documents shall be filed with the clerk of the supreme court and the members of the court.

Each side shall have seven days from the date of December 27, 1991, to file written objections to the other side's plan. After each side has filed its written objections, the Commission shall forthwith hold an expedited hearing. On the completion of the expedited hearing, the Commission shall submit an adopted plan, in addition to any other plan considered by the Commission during the hearing. These plans and data must be in the manner prescribed by the Commission rules.

Defendant State Board of Elections shall submit a schedule that shall provide dates for filing nomination petitions for the Senate and House.

It is imperative that a redistricting plan be approved; however, if a plan is not approved on or before January

6, 1992, the only alternative at that point in time will be for this court to declare an at-large election for the Illinois Senate and House, leaving the redistricting map for another day. This court also emphasizes that these directions do not in any way suggest that the adopted plan or plans submitted to this court will be automatically approved by this court.

This court retains jurisdiction over all motions still pending until this court has reached a final decision in this matter. This court shall retain jurisdiction of this cause until the Commission submits an approved map in line with this opinion and guidelines offered in *Hastert*. See *Schrage*, 88 Ill. 2d at 105.

*Remanded to Commission,*
*with directions.*

CHIEF JUSTICE MILLER, dissenting:

Unlike the majority, I would consider now, without any further delay, the merits of the Commission's redistricting plan. Today's decision unnecessarily postpones our resolution of the important issues presented by this case, jeopardizing the timely adoption of a constitutional map—one that accurately reflects the substantial shifts in population that have occurred in Illinois since the last decennial census.

Before this court, the plaintiffs raise a number of important issues concerning the redistricting plan adopted by the Commission. The plaintiffs argue, as a preliminary matter, that the procedures leading up to the adoption of the plan were fatally flawed. In addition, the plaintiffs challenge the Commission plan on a variety of substantive constitutional and statutory grounds. In this regard, the plaintiffs contend that certain specified districts in the plan violate the rights of women, violate the rights of minorities, are the result of political gerrymandering, and are insufficiently compact. The majority

opinion resolves only peripheral questions—and those incorrectly—and fails entirely to provide the parties with any decision, or meaningful guidance, on the substantive issues before the court. Although the majority invites the parties to submit additional redistricting plans, the majority neglects to explain what criteria will eventually control our acceptance or rejection of those maps, which later may very well be challenged on the same grounds raised here.

The majority concludes that the present record does not afford us a sufficient evidentiary basis on which to resolve the plaintiffs' various challenges. The majority believes that the defects it finds in the record may be attributed to the Commission's failure to conduct any fact-finding hearings on the Jourdan II Plan, which the Commission ultimately adopted. The majority further declares that, in the absence of a hearing, this court can neither approve nor disapprove the adopted plan, no matter how fair, compact, or contiguous its districts might be. There is, however, no requirement that the Commission hold such hearings on the proposals before it; even if such a requirement existed, I could not agree with the majority's suggestion that the Commission's failure to conduct a public hearing on the plan would necessitate our rejection of it.

There is no requirement, constitutional or otherwise, that fact-finding hearings be conducted by the Commission. Neither the constitutional drafters nor the persons present at this Commission's creation believed that fact-finding hearings would be necessary for the complete performance by the Commissioners of their duties. The detailed provisions contained in section 3 of the legislative article, which govern the operations of the Commission, contain no requirement that the Commission hold hearings on the redistricting proposals before it. (See Ill. Const. 1970, art. IV, §3.) Moreover, the Commission's

own rules, which the eight original members adopted unanimously, do not require the holding of fact-finding hearings on redistricting proposals. Although the Commission's failure to hold a public hearing on the plan it adopted might conceivably cause us to scrutinize more closely that plan and the data offered in support of it, the absence of such public input should not automatically render the plan invalid, regardless of its merits. See *Karcher v. Daggett* (1983), 462 U.S. 725, 759, 77 L. Ed. 2d 133, 160, 103 S. Ct. 2653, 2674 (Stevens, J., concurring).

In any event, the record of the Commission's proceedings is far from barren. The Jourdan II Plan represented the culmination of the redistricting process; it was produced following the presentation of the Jourdan I Plan and the receipt of commentary on that earlier proposal. Thus, it is difficult to understand the majority's apparent pique with the parties' submission of their final proposals near the end of the Commission proceedings. The Commission had before it a broad range of information that it could use in developing a redistricting map. Numerous persons testified at the Commission's public hearings. These witnesses, who came from urban and rural areas throughout the State, not only commented on the relative merits and demerits of other specific redistricting proposals, but also provided general testimony on the needs and interests of the communities they represented. Other persons, too, representing a broad range of views, were consulted by the principal drafters of the Jourdan II Plan. Apart from these sources of information, the Commission also had available to it the extensive record made by the legislature itself during its own consideration of the matter, including the data and testimony compiled during that stage of the process. As demonstrated by the affidavits submitted by the parties, all this testimony, census data, and other in-

formation were considered in the formulation of the Commission's plan. And all of this information is included in the record before us.

Determining nonetheless that the present record requires supplementation, the majority remands the matter to the Commission for further proceedings and invites the parties to submit additional maps. Also, the majority opinion summarily concludes, without analysis, that certain districts contained in the Jourdan II Plan appear to violate constitutional requirements concerning compactness and racial dilution, and the majority directs the Commission to consider these objections further.

As I have noted, however, the majority's decision resolves none of the substantive issues now before us, and the parties are left without any meaningful guidance on the substantive legal principles that frame the plaintiffs' challenges. Thus, it is simply not clear why the majority believes that certain districts are not compact while others are. Nor is it clear why other districts both lack compactness and implicate concerns of racial dilution, or why still other districts implicate only concerns of racial dilution.

The majority opinion does not explain the grounds for its apparent rejection of these districts, and the opinion fails entirely to resolve the different legal issues raised by the parties in connection with these specific challenges. And in directing the Commission to consider these objections to particular districts in the new proceeding, the court inexplicably includes in its lists certain districts that are not challenged at all, by any party. If the majority is in fact concerned about districts that until now have gone unchallenged, or that should be challenged on grounds different from those raised by the parties, then the majority should at least make that clear. In any case, I do not see what can be gained from the majority's request to the Commission that it resolve

the constitutional questions that should be answered by this court.

Contrary to the majority's view, I believe that the plaintiffs' substantive and procedural challenges to the Commission's plan may be determined at this time, on the basis of the information now before this court. The parties have submitted extensive briefs and supporting documentation on these various issues. Indeed, the record before us appears to be as complete as the one presented to the three-judge panel in *Hastert v. State Board of Elections* (N.D. Ill. 1991), 777 F. Supp. 634, which the majority initially refuses to adopt but then later endorses as a model. If in fact the record in this case is incomplete and we lack certain data or other information necessary for the resolution of these questions, as the majority suggests, but that I do not believe, then we should enter an appropriate order and direct the parties to supply the absent evidence on an expedited basis.

By remanding the present matter to the Commission without analyzing any of the substantive or procedural issues raised by the parties, the court is postponing, if not abdicating, the performance of its constitutionally mandated duty to determine the validity of the redistricting plan adopted by the Commission. In addition, the majority's decision severely limits the possibility that the parties might reach a compromise and settle on a valid map that is acceptable to all. Determining the merits of the plaintiffs' underlying claims, and not just the specific challenges to certain districts, would at least enable the parties to proceed in their mapmaking with some guidance on the applicable principles of law. Little can be gained through the majority's procedure, except to put off to another day this court's resolution of the issues presented here, a determination the majority has intimated it might escape by calling for an at-large elec-

tion if no satisfactory plan is proposed. Although the parties have not addressed the prospect of an at-large election, that procedure itself might implicate the Federal Voting Rights Act, which influenced the drawing of many of the districts complained of here.

We have before us a full and complete record on which to decide the present matter. Rather than delay further the resolution of this controversy, I would consider now the various substantive and procedural issues raised by the plaintiffs in their challenges to the Commission's redistricting plan. For these reasons, I respectfully dissent.

JUSTICE MORAN joins in this dissent.

*Opinion filed January 14, 1992.*

JUSTICE CUNNINGHAM delivered the judgment of the court:

As stated in the order of this court dated January 10, 1992, the Legislative Redistricting Commission (the Commission) has complied with the procedural and substantive directives of our December 13, 1991, opinion, and article IV, section 3, of the Illinois Constitution of 1970.

Following the December 13, 1991, opinion, the Commission held expedited hearings on January 4 and 5, 1992. At that time, the Commission heard testimony by experts on behalf of the parties, and reviewed affidavits filed on behalf of the parties, as well as voluminous documents, including those documents submitted by the main intervenors. The Commission focused the hearing on two plans, Certain Intervenors' Proposed Remedial Redistricting Plan (CIP II-A), and the Commission's plan, Jourdan III-A.

Before addressing either of the proposed plans, we must make certain findings in light of the extraordinary

circumstances of the case at hand with the hope that this situation will not again be before this court and place in jeopardy the voting rights of the people of this State. Throughout the process, we noted the troubled winds that have unfailingly roared through the legislature, the Commission and the media; needless to say, these criticisms do have bearing, adverse at best, on any plan this court may adopt or fashion. However, time, staff and budget demands do not permit this court to fashion its own redistricting plan that meets all of the objectives, no matter how desirable. The most important consideration, and the underlying thrust of this opinion, is the interest of the voters of this State. The interest of the voters mandates holding elections on time. It is that consideration and the lack of sufficient budget and time which prevents this court from competently drawing a map that would take into account the diverse interests at stake in this litigation. We are more concerned with the prospect of denying the voters the right to choose the representative of their choice and of denying equality in voting, *i.e.*, one man, one vote.

It is also of the utmost importance for all parties involved to understand that the necessity of compromise is essential to any politically fair redistricting plan. Too many interests exist in this matter, both represented and unrepresented, to keep clearly in mind. Furthermore, as the population increases and changes, the need to compromise becomes an integral part of the goal to protect the rights of the voters. This is a country which believes everyone has a fair chance. Those democratic values, so firmly entrenched in this country, make compromise essential. In our view, that element of compromise is profoundly lacking in this matter. Furthermore, the parties must understand that by adoption of the Commission plan, this court in no way has expressed an overwhelming acceptance of the plan of the Commission. The hold-

ing of this court has been made with the best interests of the voters in mind.

The tortuous process which we have just experienced is not in the best interests of the voters of this State. The legislature has eight years, if it is sincere, to correct this process in order that the voters with special interests will have an opportunity to participate in the election process. After all of the deliberation and expense to the taxpayers, over $2 million, we do not find that a lottery or a flip of a coin is in the best interests of anyone except the party which has won the toss. The rights of the voters should not be part of a game of chance. The consequences of such a method affect everyone.

We further conclude that any order of this court issued after January 19, 1992, would be too late to establish proper election procedures. An order issued after this date would not give candidates enough time to decide whether to run. Nor would it give those involved in the election process time to prepare. Most importantly, it would not give voters adequate opportunity to familiarize themselves with their districts and their candidates. If elections are to be timely held, they must be held pursuant to existing law. We find it preferable to hold elections on the date already established for State elections. Conducting special elections would result in lower voter turnout and place extraordinary expenses on the State at a time when this court takes judicial notice of extreme budgetary constraints.

In light of our overwhelming concern for the voting rights of the people of this State, we cannot, in good conscience, order an at-large election which would place a heavy burden on the budget of this State and place tight time constraints on the proper functioning of the State Board of Elections. The above considerations have made this court reach its conclusion.

It is well established that the map submitted by the constitutionally mandated Commission is valid unless it is against the manifest weight of the evidence. (Ill. Const. 1970, art. IV, §3(b).) Thus, the parties opposing the map must establish that not only their map or maps are superior, but that the Commission map is against the manifest weight of the evidence.

In testing each map submitted, the court viewed each map with these issues in mind:

(1) whether the plan satisfies the Illinois constitutional requirement of substantially equal population in each district;

(2) whether the map has provided adequate representation to minorities and other special interests to satisfy various State and United States constitutional rights as well as Federal statutes, *i.e.*, racial, ethnic and gender;

(3) whether the maps satisfy the compactness requirements of the Illinois Constitution; and

(4) whether the maps meet all legal requirements regarding political fairness.

Based on the testimony of the expert witnesses and the negative responses to both plans, the adoption by this court of one of the plans submitted by either party would actually be a reflection on legislative policy choices. After reviewing all of the evidence submitted, this court finds that both plans are similar regarding compactness. However, the Commission map meets all four requirements. In finding thus, we did not judge the credibility of each expert, but rather relied on the statistics provided.

For the reasons stated, we hold that the Jourdan III-A map is valid. It is the order of this court that the State Board of Elections establish the boundaries in accordance with the Jourdan III-A map. On order of this

court, the clerk of this court is directed to issue the mandate forthwith.

*Map approved.*

CHIEF JUSTICE MILLER, concurring:

I concur in the judgment of the court but for reasons different from those expressed by the majority.

As the majority opinion observes, the Legislative Redistricting Commission has fully complied with the mandate contained in this court's opinion of December 13, 1991. Following the parties' submission of two new redistricting maps, the Commission conducted extensive evidentiary hearings on those proposals, as amended, and addressed the concerns previously raised by this court. At the conclusion of the hearings, the Commission adopted a new statewide redistricting plan, Jourdan III-A.

I note, at the outset, that we are not being called upon in the present case to judge either the wisdom or the validity of the procedures mandated by the Illinois Constitution for formation of the Commission (see Ill. Const. 1970, art. IV, §3(b)). Significantly, the parties have not questioned the constitutionality of the method used to select the Commission's ninth member. Nor has any member of this court seen fit to raise the issue *sua sponte* at any earlier point in these proceedings. In any event, I believe that a due process challenge to the tie-breaking procedure would fail. In *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, this court upheld, against constitutional attack on first amendment and equal protection grounds, the general scheme prescribed for the selection of the Commission members. Although a due process challenge to the tie-breaking procedure was not raised in that case, I believe that this new argument would fail as well.

As framed by the court's earlier mandate in this case, our task now is simply to review the statewide redistricting plan adopted by the Commission and determine whether it satisfies the criteria by which such plans must be measured. The record before us demonstrates that the Jourdan III-A plan fully meets all relevant constitutional and statutory redistricting requirements and, moreover, is superior in these respects to the plan submitted by certain intervenors, CIP II-A. The legislative and representative districts drawn by Jourdan III-A are substantially equal in population, are sufficiently compact, are fair to minorities, and are fair to both major political parties. In virtually all respects, too, the districts contained in the Jourdan III-A plan more closely meet these requirements than do the districts found in the intervenors' proposed map. Thus, unlike the majority, I would uphold the plan adopted by the Commission—not because we lack the time, staff, or resources to draw a better map ourselves, as the majority opinion suggests, but because the Commission's plan satisfies all applicable requirements and is superior to the one submitted by certain intervenors.

For these reasons, I concur in the judgment of the court adopting the Jourdan III-A statewide redistricting plan.

JUSTICE HEIPLE, also concurring:

The practice and custom of honoring great personal achievements and famous people has been around since the mind of man runneth not to the contrary. Such recognition is accomplished in many ways. Often, statues are erected. Also, the names of places, events and things may be given the name of the person to be honored. Public holidays may be declared as in the case of George Washington, Abraham Lincoln and Casimir Pulaski, to mention a select few. Physicians often have diseases

named after them. A man once told me with great pride that his great-grandfather, a doctor, had given his name to an entire plague, surely the capstone of medical recognition. I later learned that this was not correct. His great-grandfather had *died* of the plague but had not given his name to it. It was a mere coincidence that his name was Bubonic.

So it is that once every decade, in State legislatures throughout this land, we honor the name of Governor Elbridge Gerry of Massachusetts. The event is triggered by the completion of the decennial census. Though the governor's name is seldom mentioned, the tribute is paid obliquely in the legislatures by engaging in the practice of gerrymandering. Governor Gerry is commonly recognized as the father of that practice and, accordingly, his name gave rise to a new word in the English language. In broad terms, gerrymandering means the manipulation of district lines for partisan political ends. It was seared in the public's consciousness by the drawing of a legislative district in Massachusetts which resembled the shape of a gargoyle or a salamander and so was dubbed a "gerrymander." In short, it was a district which lacked compactness and which was drawn for partisan political ends. The word "gerrymandering" was coined as a pejorative and that connotation continues to this very day. It is, however, a practice that is both universally condemned and universally followed. The parties to this lawsuit, likewise, have all both condemned and followed the practice.

The best recent summation of gerrymandering is contained in a short policy study authored by Daniel D. Polsby and Robert D. Popper. It states:

"There are different varieties of gerrymandering, including racial gerrymandering, remedial racial gerrymandering, collusive bipartisan gerrymandering, and probably others. But the most common kind *** is gerrymandering

undertaken by the political party in control of a state legislature in order to help itself and injure its competitor.

The techniques for gerrymandering are conceptually simple. In single-member district elections, only one legislator can win in a district. Any support beyond 50 percent-plus-one is therefore superfluous, or, from the party's point of view, 'wasted.' The partisan map-maker seeks to draw lines that concentrate the opposition's electoral support in just a few districts (called 'packing' or 'stacking'), while at the same time creating many more districts where his own party commands a small, but still safe, majority ('cracking').

The end result is that the opposition party's votes are squandered by being thrown into carefully constructed landslides. The gerrymandering party thus can win more seats in proportion to its overall electoral support than it would if the district lines were drawn by someone oblivious to partisan considerations." D. Polsby & R.D. Popper, *Partisan Gerrymandering: Harms and a New Solution*, A Heartland Policy Study (The Heartland Institute, Chicago, Ill.), No. 34, March 4, 1991.

The simple facts of the instant case are that reapportionment failed in the General Assembly which caused the case to be referred to the Illinois Legislative Redistricting Commission. When the Commission, which was evenly divided between Republicans and Democrats, failed to agree, a tie-breaker additional member was drawn and added to the Commission. The Republicans won the draw. The Commission then adopted a Republican-sponsored map which was challenged by the Attorney General, *et al.*, in this lawsuit. The Constitution provides that the supreme court shall have original and exclusive jurisdiction over actions concerning redistricting the House and Senate, which shall be initiated in the name of the People of the State by the Attorney General. Ill. Const. 1970, art. IV, §3(b).

Feeling the need for more information, this court remanded the case to the redistricting commission to con-

duct further study and report back to the court. The result of that remand was yet a new map called Jourdan III-A and a detailed report to justify the map. Various other maps have been submitted by the parties involved in this litigation. In addition, the parties have roundly criticized each other's maps. All are gerrymandered to suit their own purposes.

The question before this court is not whether the Jourdan III-A map is gerrymandered to some extent. It is. The question, rather, is whether it meets Illinois constitutional guidelines. That is to say, are the districts therein delineated found to be compact, contiguous and substantially equal in population? (Ill. Const. 1970, art. IV, §3(a).) If found to be the case, this court has no option but to approve the map. It is, after all, a map drawn and submitted according to law by a governmental body charged with the responsibility of drawing the map. (Ill. Const. 1970, art. IV, §3(b).) The function of the Illinois Supreme Court in this case in the first instance is to review what has been done by the body charged with that responsibility to determine if it has comported itself and discharged its responsibility in a lawful, legal manner. If it is determined that such has been done, that is the end of the matter. Since I believe that the Jourdan III-A map meets the Illinois constitutional guidelines in a sufficient manner, I support the adoption of that map.

In so ruling in favor of the Jourdan III-A map, however, I acknowledge that it is not a perfect map from the standpoint of compactness. A visual examination of the map shows unusual shapes for some of the districts in Chicago and environs. Downstate, this difficulty is not observed. It must be noted, however, that ideal compactness in a densely populated urban district that is but a few city blocks across is of far less consequence than lack of compactness in a rural area that may stretch across many miles. That the map could have been drawn

better I have no doubt. Whether the map could have been drawn better, however, is not the issue. The issue is whether the map meets constitutional guidelines and whether the Commission discharged its duty in a lawful matter. It does and they did.

In passing, I note that all of the maps submitted to this court by all of the parties are flawed maps. All were drawn with a view to securing a partisan political advantage. That the Jourdan III-A map is obnoxious to various contesting parties goes without saying. That the other maps are equally obnoxious for similar reasons is also true.

The drawing of a reapportionment map is essentially a *political* and not a *judicial* process. It becomes judicial only if the parties who have the responsibility of drawing a map violate the law and produce a legally unacceptable map. A map that is *politically* unacceptable to one political party is not, for that reason, *legally* unacceptable. The courts must necessarily extend latitude to the political and governmental authorities in discharging their duties. Otherwise, the courts would become a political rather than a judicial institution. Had this court rejected the Commission's adoption of the Jourdan III-A map and then chosen one of the competing partisan maps, that would have been a political and not a judicial decision.

Were the Jourdan III-A map to be rejected by this court, there would be but a single option, an at-large election for all members of the House and the Senate. While this was a possible alternative, it would have been a poor choice for the people of Illinois. Implementing legislation to conduct an at-large election would have been necessary. Great uncertainties would have been introduced into the electoral process. Normal electoral processes would have been severely disrupted and great costs would have been imposed on the electorate.

Some may suggest that the court itself could have purchased a package of crayons and drawn its own map. This was not a feasible alternative. The parties to this lawsuit have spent millions of dollars and weeks of effort to produce the maps that were submitted. This court lacks the resources to hire computer experts, election experts and cartographers for that purpose. Moreover, time is short and election day draws closer. It is problematic whether this court even with time, money and experts could have produced a better map than Jourdan III-A and still had any semblance of a normal electoral process. That any map could ever be produced which would be free from complaints of bias and unfairness is doubtful.

Because I believe that the Jourdan III-A map meets legal guidelines and because I believe there is no other feasible alternative, I support the adoption of the Jourdan III-A map as reported out by the Illinois Legislative Redistricting Commission and I specially concur in the opinion enunciated by Justice Cunningham and submitted in this case.

JUSTICE CLARK, dissenting:

In *People ex rel. Burris v. Ryan* (1991), 147 Ill. 2d 270 (*Ryan I*), this court began its discussion of the constitutional requirements of a redistricting map with the observation that such a plan "must not accomplish political gerrymandering and must keep communities of interest." (*Ryan I*, 147 Ill. 2d at 280.) The term "community of interest" has been used by several courts over the years to define a politically neutral criterion which can be used in redistricting. This idea of a community of interest makes an assumption—that the people of a voting district share the same values, ethnicity or economy. Residing in a voting district should allow the people who have the same interests to elect repre-

sentatives who will advocate those interests. Because I do not believe the maps submitted for approval to this court have been drawn with the community of interest in mind and because I believe that they are constitutionally infirm, I respectfully dissent from the majority opinion.

It is the duty of a legislative redistricting entity to provide "fair and effective representation for all citizens." (*Reynolds v. Sims* (1964), 377 U.S. 533, 565-66, 12 L. Ed. 2d 506, 529, 84 S. Ct. 1362, 1383.) This duty has been recognized in several instances by the United States Supreme Court. (See, *e.g., Gomillion v. Lightfoot* (1960), 364 U.S. 339, 5 L. Ed. 2d 110, 81 S. Ct. 125 (racial fairness); *Reynolds v. Sims* (1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (population equality); *Gaffney v. Cummings* (1973), 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321; *Davis v. Bandemer* (1986), 478 U.S. 109, 92 L. Ed. 2d 85, 106 S. Ct. 2797 (plurality opinion) (political fairness).) The Illinois Constitution provides a set of requirements to ensure that this duty is fulfilled. (Ill. Const. 1970, art. IV, §3(a).) The initial concern in drawing boundary lines for proposed representative and legislative districts is compactness. While it is an end to be sought in the redistricting process, its special purpose is to combat political gerrymandering. In remanding this matter to the Commission, we specifically identified several districts created by the proposed map as "not appear[ing] to meet the constitutionally mandated requirements" in three categories, two of which included the compactness requirement. *Ryan I*, 147 Ill. 2d at 285.

While the parties have addressed issues of population equality and racial fairness in the new maps presented to this court, they have brushed aside the requirement of compactness, in spite of our directive in

*Ryan I*. In essence, the parties have presented gerrymandered maps.

In a memorandum of law submitted to this court by the Commission, a majority of those members concede that "both plans contain districts which, in isolation, appear oddly shaped." In a disingenuous sleight of hand, however, these same members maintain that "this is a natural occurrence given the other goals which want to be accommodated in redistricting." Both of the experts appearing before the Commission's hearing testified that compactness is a "concept rapidly diminishing in significance in redistricting." I disagree. This concept is constitutionally mandated. "The compactness standard is, after all, a constitutional requirement in Illinois (Ill. Const. 1970, art. IV, §3(a)) and cannot be ignored in redistricting the State. It cannot be written out or replaced by another requirement short of redrafting or amending our present constitution." (*Schrage v. State Board of Elections* (1981), 88 Ill. 2d 87, 96.) Proponents of this thinking seek to impose a map advantageous to their allies upon the voters of this State. Although it may be said that compactness is subservient to the goals of population equality and fairness to minorities, I am not convinced it is impossible to draw a map which serves all of these goals.

Although I recognize and accept that political considerations will inevitably be intertwined in the development of a constitutional redistricting plan, I believe that this court and the parties before it must focus their attention on whether this redistricting map guarantees the citizens of the State of Illinois fair and effective representation. In *Gaffney v. Cummings* (1973), 412 U.S. 735, 752, 37 L. Ed. 2d 298, 312, 93 S. Ct. 2321, 2331, the Supreme Court stated that "[i]t would be idle *** to contend, that any political consideration taken into account in fashioning a reapportionment

plan is sufficient to invalidate it." Thus, while politics and political considerations unfortunately have had more than a subtle influence on this proposed map, the resulting analysis conducted by this court must set aside the partisan and special interest bickering and stress the mandate of our State Constitution that the legislative and representative "[d]istricts shall be compact, contiguous, and substantially equal in population." Ill. Const. 1970, art. IV, §3(a).

Over the years, reviewing courts have taken judicial notice that political data is available to redistricting authorities and is taken into account by those authorities in drawing maps. (*Gaffney*, 412 U.S. at 753, 37 L. Ed. 2d at 312, 93 S. Ct. at 2331.) As Justice White wryly observed in *Davis v. Bandener*, "As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." (*Davis*, 478 U.S. at 129, 92 L. Ed. 2d at 103, 106 S. Ct. at 2809 (plurality opinion).) I make that assumption about the maps promoted by the parties to this case. I am not persuaded by the explanations for district configurations forwarded in the affidavits submitted to the Commission. Oddly shaped districts are frequently used to divide communities with shared interests and to link communities which are geographically and economically disparate, and it is quite obvious that the purpose of some of those districts is not to achieve population equality or racial fairness. " '[I]f it clearly appear[s] that in the formation of any district the requirement of compactness of territory and equality in population had been wholly ignored, had not been considered or applied at all, to any extent, then the [result] would be clearly unconstitutional.' " *Schrage*, 88 Ill. 2d at 96, quoting *People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 477.

If any fundamental principle underlies our American system of government, it is the notion that government exists only to serve the governed. The Illinois Constitution provides that "All elections shall be free and equal." Implicit in this declaration is the idea that voter choices should not be narrowed artificially by redistricting. An artificially weighted map may ensure a political party's dominance of a legislative body for a decade or more, but it does not ensure that a citizen's right to elect officials who will represent him effectively is protected.

In my opinion, this court should draw its own redistricting map that provides fair and effective representation to the citizens of this State. In doing so, a trial judge would be selected to conduct an evidentiary hearing on the constitutional requirements of compactness, contiguity and equality in population, and who would then provide recommendations to this court. See *Carstens v. Lamm* (D.C. Colo. 1982), 543 F. Supp. 68; *Wisconsin State AFL-CIO v. Elections Board* (E.D. Wis. 1982), 543 F. Supp. 630 (where the courts drew their own maps rather than adopt maps proposed by the parties).

I believe the framers of the Illinois Constitution of 1970 intended the compactness requirement of article IV, section 3, to protect the citizens of this State from the type of political gerrymandering which predominates the maps submitted. By placing their own political self-interests above the citizens' right to a fair and representative form of government, the parties to this dispute have struck a blow against this fundamental right. While I do not naively believe that partisan politics will never play a part in the redistricting process, I cannot in good conscience approve a legislative redistricting map which places partisan politics above the interests of the citizens of this State.

The role of the courts in our system of government is to balance the interests of the State against the interests of the public and the individual. I believe that this court, in carrying out its role, is obliged to listen not only to the voices of those special interests clamoring to be heard, but to all the citizens of this State, whose right it is to have a redistricting plan that ensures neutral reapportionment and guarantees fair and effective representation.

JUSTICE FREEMAN joins in this dissent.

JUSTICE BILANDIC, also dissenting:

The procedure set forth in the Illinois Constitution of 1970 for adopting a redistricting plan violates due process as guaranteed by the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV). Therefore, I respectfully dissent.

Article IV, section 3(b), of the Illinois Constitution of 1970 provides, in pertinent part:

"In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative Districts ***.

If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10. The Commission shall consist of eight members, no more than four of whom shall be members of the same political party.

The Speaker and Minority Leader of the House of Representatives shall each appoint to the Commission one Representative and one person who is not a member of the General Assembly. The President and Minority Leader of the Senate shall each appoint to the Commission one Senator and one person who is not a member of the General Assembly.
***

Not later than August 10, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.

If the Commission fails to file an approved redistricting plan, the Supreme Court shall submit the names of two persons, not of the same political party, to the Secretary of State not later than September 1.

Not later than September 5, the Secretary of State publicly *shall draw by random selection* the name of one of the two persons to serve as the ninth member of the Commission.

Not later than October 5, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members." (Emphasis added.) Ill. Const. 1970, art. IV, §3(b).

As set forth above, when the Redistricting Commission has reached a deadlock in the redistricting process, the Secretary of State must draw the name of the tie-breaking Commission member by "random selection." (Ill. Const. 1970, art. IV, §3(b).) Only once since the adoption of the Illinois Constitution of 1970 has redistricting been accomplished without a ninth tie-breaking member being chosen by random selection to become a member of the Legislative Redistricting Commission. In 1971, after the General Assembly failed to redistrict itself prior to June 30, the Legislative Redistricting Commission adopted a redistricting plan and submitted it to the Secretary of State without the need for the appointment of a ninth tie-breaking member. (See *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 158.) However, the tie-breaking procedure has since been utilized in both the 1981 and the 1991 redistricting processes. See *Schrage v. State Board of Elections* (1981), 88 Ill. 2d 87, 92.

It is the procedure outlined above for the resolution of a deadlocked Commission vote by the *random selection* of a tie-breaking ninth member that violates the

constitutional guarantee of due process. The fourteenth amendment to the United States Constitution provides that no person shall be deprived of "life, liberty, or property" without due process of law. (U.S. Const., amend. XIV.) Due process preserves an individual's personal and property rights from the arbitrary action of public officials. (*People v. Belcastro* (1934), 356 Ill. 144, 147.) The essence of due process is "fundamental fairness." (*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 24, 68 L. Ed. 2d 640, 648, 101 S. Ct. 2153, 2158.) When a governmental procedure fails to comport with fundamental fairness, but is instead arbitrary and unreasonable, it violates the fourteenth amendment. (*Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 563; *Magnuson v. City of Hickory Hills* (N.D. Ill. 1990), 730 F. Supp. 1439, 1444.) The guarantee of due process of law is not limited to judicial proceedings. *Brown v. Air Pollution Control Board* (1967), 37 Ill. 2d 450, 454.

"Liberty," as that term is used in the fourteenth amendment, includes the right of every citizen to vote, both in State elections and Federal elections. (*Reynolds v. Sims* (1964), 377 U.S. 533, 554-55, 12 L. Ed. 2d 506, 523, 84 S. Ct. 1362, 1378; *Rudisill v. Flynn* (N.D. Ill. 1979), 470 F. Supp. 1269, 1274.) The due process clause of the fourteenth amendment guarantees to every citizen the right to participate on a fair and equal basis in the electoral process. (*Duncan v. Poythress* (N.D. Ga. 1981), 515 F. Supp. 327, 336.) The United States Supreme Court has recognized the preeminence of this right, stating:

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. * * *

*  *  *

*** To the extent that a citizen's right to vote is debased, he is that much less a citizen." (*Reynolds*, 377 U.S. at 555, 567, 12 L. Ed. 2d at 523, 530, 84 S. Ct. at 1378, 1384.)

The establishment of legislative districts impacts the rights of Illinois citizens to participate on a fair and equal basis in the electoral process. Consequently, when the establishment of legislative districts is accomplished in an arbitrary manner, the right of Illinois citizens to due process of law is violated.

The conclusion that the tie-breaking scheme set forth in article IV, section 3(b), of the Illinois Constitution of 1970 violates the requirement of due process is supported by this court's opinion in *Walker v. State Board of Elections* (1976), 65 Ill. 2d 543. In that case, this court held that the lottery-type of tie-breaking procedure provided for in section 1A—7.1 of the Election Code (Ill. Rev. Stat. 1973, ch. 46, par. 1A—7.1) was unconstitutional. That section stated:

"In the event there is a tie vote of the membership of the State Board of Elections with respect to proposed action of the Board or with respect to any issue requiring a vote by the Board, the clerk of the Board upon the direction of any 2 members who certify that there is a deadlock, *shall select by lot* the name of one of the members of the Board. The member so selected shall be disqualified from voting on the particular proposition and the remaining qualified members shall proceed to decide the proposition." (Emphasis added.) Ill. Rev. Stat. 1973, ch. 46, par. 1A—7.1.

This court found that the tie-breaker provision was unconstitutional in that it violated due process of law because it caused decisions of the State Board of Elections to be made by lot or by chance in some cases. (*Walker*, 65 Ill. 2d at 563; see also *Kandalepas v. Economou* (1989), 191 Ill. App. 3d 51, 54 (the trial

court's flipping of a coin to determine an issue in dispute was improper because an act of chance determined the outcome rather than a balancing of the equities in the case).) The *Walker* court stated:

> "Necessarily included within the tie breaker's scope are those actions and issues upon which rights of individual parties depend. As a result, if the tie breaker, when utilized, causes decisions to be arrived at in an arbitrary manner, the statute must then be considered violative of due process.
>
> In our estimation, the tie-breaker scheme does cause decisions to rest upon an arbitrary basis. Operation of the tie breaker results in the disqualification of one Board member whose name is selected by lot. The remaining members then 'proceed to decide the proposition,' the logical expectation being that each member will adhere to his former position, with two of the three members now constituting a majority. Since the resolution of the controversy depends upon the identity of the member eliminated by the lottery, the *ultimate outcome rests not upon reasoned deliberation, but upon chance.*
> * * *
>
> We realize that the remaining members are not inflexibly precluded from altering their prior views upon the disqualification of their colleague. Nevertheless, it strains credulity to suggest that any shift of position would be likely to occur, given the fact that the tie breaker comes into operation only when the inability to reach agreement produces a deadlock. We also concur with defendants that the tie breaker does not overtly cause decisions to be made through chance, as would be the case, for example, if the matter at issue were decided by the flip of a coin. However, since the ultimate outcome, as we have seen, is dependent upon the identity of the member whose name is selected by lot, and who is thereby disqualified from voting upon the proposition at issue, defendants urge upon us a distinction without a difference." (Emphasis added.) *Walker*, 65 Ill. 2d at 563-64.

I believe that the reasoning of the *Walker* court applies in this case. The tie-breaking scheme in article IV, section 3(b), is fundamentally no different from the tie-breaking scheme found to be unconstitutional in *Walker*. The tie-breaking provision at issue in *Walker* provided for removing by random selection one member of the decisionmaking body in the event of a deadlock. Article IV, section 3(b), provides for the addition of a new member in the event of a deadlock.

I recognize that this court, in *People ex rel. Scott v. Grivetti* (1972), 50 Ill. 2d 156, stated that article IV, section 3(b), "does not infringe upon any constitutionally protected interests." (*Scott*, 50 Ill. 2d at 160.) However, in that case, article IV, section 3(b), was challenged only on the grounds that it was violative of the first amendment and the equal protection clause of the fourteenth amendment. The *Scott* court was not presented with a due process argument, and therefore *Scott* is not controlling.

I note that the fundamental unfairness of the tie-breaking procedure set forth in article IV, section 3(b), was addressed by defendant Ryan just prior to the September 5, 1991, drawing to select the name of the tie-breaker. Defendant Ryan stated:

"I think everyone is aware that this random drawing, which is charged to me by the Constitution, will affect how the people of Illinois are governed and who their representatives will be and probably which party's philosophy will prevail in the State of Illinois, or in the next ten years, at least.

*I believe this is a bad process and bad government. The People of Illinois deserve better, and they deserve representation that's not by lottery. I don't think this process really serves the people well.* But the whole point of the legislative process is to achieve compromise.

Legislators can't just flip a coin or pull an answer out of a hat anytime they're forced to face a tough decision. So, let me say that I hope that we really don't have to do this in another ten years." (Emphasis added.)

For the reasons stated above, I believe that the tie-breaking procedure set forth in article IV, section 3(b), of the Illinois Constitution of 1970 violates the due process clause of the fourteenth amendment to the United States Constitution. Any redistricting plan produced as a result of the tie-breaking procedure is therefore unconstitutional and invalid.

There is no need to delay the primary election. The candidates can run in the existing legislative districts and serve until a constitutional map is adopted. This procedure was recently approved by the United States Supreme Court for elections in the State of Mississippi. *Watkins v. Mabus* (1991), ___ U.S. ___, 116 L. Ed. 2d 433, 112 S. Ct. 412.

We should not hasten to gamble away the government "of the People, by the People, and for the People" on the turn of a card, roll of the dice, or even random selection.

JUSTICES CLARK and FREEMAN join in this dissent.