(No. 92443.—

DIEDRA L. COLE-RANDAZZO *et al.*, Plaintiffs, v. JIM RYAN, Illinois Attorney General, *et al.*, Defendants.

*Opinion filed November 28, 2001.*

THOMAS, J., joined by GARMAN, J., dissenting.
GARMAN, J., joined by THOMAS, J., also dissenting.

Mary Lee Leahy, of Leahy Law Offices, of Springfield, for plaintiffs.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Michael P. Doyle, Assistant Attorney General, of Chicago, of counsel), for defendants.

Steven F. Molo, Kenneth T. Kristl, Joseph A. Spiegler, Jessica L. Gonzalez and Michael P. Rohan, of Winston & Strawn, of Chicago, for intervenor-plaintiff James Philip.

Steven F. Molo, Kenneth T. Kristl, Joseph A. Spiegler, Jessica L. Gonzalez and Michael P. Rohan, of Winston & Strawn, of Chicago, and James G. Sotos, of Hervas, Sotos, Condon & Bersani, P.C., of Itasca, for intervenor-plaintiff Lee A. Daniels.

James D. Montgomery, of James D. Montgomery & Associates, and Courtney C. Nottage, Rudolph M. Braud, Jr., Shannon K. Moorer and James W. Dodge, all of Chicago, for intervenor-defendant Emil Jones, Jr.

David W. Ellis, of Williams, Collins & Bax, and William J. Harte, all of Chicago, for intervenor-defendant John Tully.

Larry R. Rogers, Larry R. Rogers, Jr., and Devon C. Bruce, of Power, Rogers & Smith, P.C., and Clyde E. Murphy and Sharon K. Legenza, all of Chicago, for *amicus curiae* African American Working Group on Reapportionment.

Maria Valdez and Patricia Mendoza, of Chicago, for *amicus curiae* League of United Latin American Citizens.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

This is an original action under article IV, section 3 of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 3) challenging the validity of the redistricting plan approved by the Illinois Legislative Redistricting Commission and filed with the Secretary of State following the federal decennial census conducted in the year 2000. Plaintiffs are three registered Illinois voters, Diedra L. Cole-Randazzo of Rochester, Harry R. Walton of Decatur, and Kamela S. Wood of Springfield. Defendants are the Attorney General of Illinois, the Illinois Secretary of State, the members of the Illinois State Board of Elections, and the Illinois Legislative Redistricting Commission (the Commission) and its members.

Plaintiffs initiated this proceeding by filing a motion for leave to file a complaint in accordance with Supreme Court Rule 382 (155 Ill. 2d R. 382). Plaintiffs' motion was granted and a briefing schedule was established. The matter was subsequently set for oral argument. Plaintiffs were allowed to file an amended complaint. The court also permitted additional parties to intervene. James "Pate" Philip, President of the Illinois Senate, and Lee Daniels, Minority Leader in the Illinois House, were al-

lowed to intervene as additional plaintiffs. Emil Jones, Jr., the Minority Leader of the Illinois Senate, and John Tully, a registered voter, were allowed to intervene as additional defendants.

In their complaint, as amended, plaintiffs challenge the boundaries established by the Commission for the 51st Legislative (Senate) District, which encompasses the 101st and 102nd Representative Districts. They also challenge the boundaries fixed by the Commission for the 99th and 100th Representative (House) Districts. Intervenors Philip and Daniels attack the Commission's redistricting plan as a whole, as well as various specific legislative and representative districts, including Legislative Districts 29, 38, 51 and 55 and Representative Districts 15, 18, 35, 36, 75, 113 and 114.

Legislative redistricting maps approved and filed under section 3 of article IV of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 3) must meet four requirements. First, the districts formed must be substantially equal in population. Second, the districts must be configured in such a way as to provide adequate representation to minorities and other special interests protected by state and federal law. Third, the districts must be compact and contiguous. Fourth, the maps must meet all legal requirements regarding political fairness. *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 296 (1992).

The challengers to the redistricting plan at issue in this case make no claim that the districts fail to meet the requirement of equality of population or that the configuration of those districts denies adequate representation to any minorities and other special interests protected by state and federal law. The contiguity of the districts is unquestioned. The legal requirements regarding political fairness are not alleged to have been infringed. The only dispute concerns whether the various districts identified by the original and intervening plaintiffs meet our state's "compactness" requirement.

The arguments presented by the original and intervening plaintiffs are essentially the same. They contend that by reconfiguring various districts, the map could be improved to make certain legislative and representative districts more compact than they are under the plan adopted by the Commission and filed with the Secretary of State. The intervening plaintiffs have attempted to quantify the potential enhancement in compactness using mathematical tests based on geographical measurements and district shapes. The original plaintiffs rely solely on visual observation.

Based on visual observation, the compactness of the districts formed under the plan before us today is not discernibly different from the compactness of the districts established under the plan approved by this court 10 years ago in *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 296 (1992). While some of the new districts are certainly more elongated than others, the same was true of districts drawn under the old map. Overall, the level of compactness has changed little.

The data submitted by the intervening plaintiffs confirm this observation. The various representative and legislative districts were analyzed by the intervening plaintiffs' experts using two different tests. The first, known as the dispersion test, compared a district's area to the area of the smallest circle that circumscribed that area. The second, called the perimeter test, measured irregularities in the boundaries of districts. The highest score a district could receive was one. The lowest was zero. The mean dispersion score for representative districts under the old map and the mean dispersion score for representative districts under the map challenged here differed by only one one-hundreth of a point (0.01). That was also the case with the mean dispersion score for legislative districts.

The results yielded by the perimeter test were com-

parable. Under that test, the difference in mean scores for representative districts under the new map and representative districts under the previous map was three one-hundredths of a point (0.03). For the old and new legislative districts, the difference in mean scores was four one-hundredths of a point (0.04).

The original and intervening plaintiffs suggest alternatives to the present map which would yield some increases in compactness both visually and under the dispersion and perimeter tests. The fact that more compact formulations can be devised is not, however, a sufficient basis for invalidating a map duly approved and filed according to law. That is so for two reasons. First, as indicated earlier in this opinion, compactness is only one of several factors that must be taken into consideration in setting the boundaries for legislative and representative districts. No matter how compact proposed districts may be geographically, those districts will not suffice under the law unless they comply with each of the additional factors we have enumerated.

The need to take the additional factors into account was specifically acknowledged in the affidavit of Professor Richard Niemi, one of the intervening plaintiffs' experts. Significantly, however, neither the original nor the intervening plaintiffs have addressed the implications of their proposed alternatives with respect to those factors. The materials they have submitted are silent on the question of how the proposed alternatives would compare in terms of equality of population, the provision of adequate representation to any minorities and other special interests protected by state and federal law, or adherence to the legal requirements regarding political fairness. Accordingly, we have no basis for assessing whether the proposed alternatives would be legally acceptable and, if so, whether they would be superior, on balance, to the plan approved and filed by the Commission.

Second, a redistricting plan approved and filed by the Commission is presumed to be valid. Ill. Const. 1970, art. IV, § 3(b). *Schrage v. State Board of Elections*, 88 Ill. 2d 87, 92 (1981). Even if a proposed alternative map would meet the other legal requirements, in addition to the requirement of compactness, parties opposing a redistricting plan approved and filed by the Commission must establish not only that their map is superior, but that the map approved by the Commission is against the manifest weight of the evidence. *People ex rel. Burris*, 147 Ill. 2d at 296. The original and intervening plaintiffs have made no such showing. Indeed, the question of how well or poorly the redistricting map approved and filed by the Commission advances requirements beyond compactness is an issue the challengers do not even address.

For the foregoing reasons, the requests by the original and intervening plaintiffs for a declaratory judgment invalidating the redistricting plan approved and filed by the Commission and for an order requiring reconfiguration of districts formulated under that plan are hereby denied. Judgment is entered for defendants. The mandate of this court shall issue immediately.

*So ordered.*

JUSTICE THOMAS, dissenting:

The last time a challenge to the validity of the redistricting plan approved by the Illinois Legislative Redistricting Commission (Commission) was raised in this court, this court initially remanded the matter to the Commission for further proceedings because the Commission did not hold a hearing on the approved map. See *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 284 (1991). We noted that both sides in the case had submitted their plans and amendments on the last two days, "thereby thwarting any type of hearing, whether for expert testimony or public criticism." *Burris*, 147 Ill. 2d at 284-85. We recognized that, although there is a

presumption that an approved redistricting plan filed with the Secretary of State is valid, the presumption of validity does not attach to any process which is completely at variance with the constitutional mandate. *Burris*, 147 Ill. 2d at 284. Finally, in remanding the matter to the Commission for further proceedings, we directed that the Commission's hearing address questions with regard to certain enumerated districts that did not appear to meet the constitutionally mandated requirements of compactness and of free and equal elections. *Burris*, 147 Ill. 2d at 285-86. It was only after the matter was returned to this court following remand that this court accorded the map a presumption of validity and reviewed the map under a manifest weight of the evidence standard. *Burris*, 147 Ill. 2d at 296.

Here, the majority does not address the process that led to the adoption of the map at issue. Rather, the majority notes the presumption of validity accorded a redistricting plan approved and filed by the Commission. The majority then concludes that the plaintiffs and intervening plaintiffs have failed to establish that the map is against the manifest weight of the evidence. I do not agree with this analysis. I find this case to be indistinguishable from *Burris*. Consequently, I believe this matter must be remanded to the Commission for further proceedings before this court can address the validity of this map.

The process through which the redistricting map in this case was approved was at variance with the constitutional mandate. As in *Burris*, the map in this case was presented in the last few days, thereby thwarting any type of hearing that would ensure that constitutional requirements were met. As intervening plaintiffs Philip and Daniels observe, the Democratic Commission members filed a map styled Currie I on September 17, 2001, and set a hearing for September 18, 2001. At the

September 18 hearing, the Republican Commission members proposed certain amendments to the Commission's rules, including allowing public comment on any redistricting proposal for at least seven days after its submission, requiring the Commission to state its reason for approving or not approving each redistricting proposal, and including findings on compactness, contiguity and population equality. The Commission rejected the proposed amendments. Also on September 18, the Democratic Commission members called a series of expert witnesses to testify concerning the Currie I map. Plaintiffs allege that the Republican Commission members had no advance notice that expert witnesses would testify. The Democratic Commission members rejected a request made by the Republican Commission members for a 24-hour recess to prepare to cross-examine the expert witnesses. The Commission also declined a request to disclose their timetable to pass a map. The next day, September 19, 2001, the Democratic Commission members proposed that votes on all maps be taken by September 21, 2001, including votes on Currie I, which had been introduced on September 17, and a vote on the Alternate Plan that was to be proposed by the Republican Commission members on September 20, 2001.

No vote was taken on September 21, 2001. On September 24, 2001, the Democratic Commission members proposed an amendment to Currie I, known as the Bilandic amendment, which was filed with the Commission clerk. The next day, September 25, the Currie I map was amended pursuant to the Bilandic amendment, thereby creating the map at issue in this case, known as Currie II. The intervening plaintiffs contend that the Democratic commission members refused to call witnesses or allow analysis or debate on Currie II. On September 24, 2001, the Republican Commission members' expert witness, Richard Niemi, Ph.D., was allowed

to testify that Currie II was less compact than the map approved in 1991 and also was less compact than the Alternate Plan. Niemi further testified that the Alternate Plan was more compact than Currie II as well as the 1991 plan. Nonetheless, on September 25, 2001, the Commission adopted the Currie II map by a 5-4 vote, and forwarded the Currie II map to the Secretary of State.

Intervening defendant John Tully responds that the Currie II map is the result of "the most extensive, deliberative and accommodating process that this State has seen in the redistricting of the Illinois House and Senate." Tully contends that the record of proceedings is 10,557 pages and that the General Assembly redistricting committees heard more than 500 live witness presentations. The majority of the record of proceedings and the 500 live witness presentations, however, do not address the constitutional validity of the specific map at issue in this case. With regard to Currie I, Tully asserts that the Commission met for more than six hours and heard testimony, including testimony from two expert witnesses, Dr. Allan J. Lichtman and Dr. Janet Box-Steffensmeier. As noted, however, the intervening plaintiffs argue that the expert witnesses were presented without any advance notice and without affording the Republican Commission members a 24-hour recess to prepare to cross-examine those witnesses. Notably, although there was testimony concerning the compactness of Currie I and Currie II, that testimony concerned the compactness of the maps as a whole, not the compactness of individual districts.

As in *Burris*, the process through which the Currie II map was adopted does not present sufficient facts for this court to determine with certainty whether the district lines in Currie II meet legal guidelines. Absent those facts, I believe this case must be remanded to the Commission for further proceedings. Further, I believe

that the Commission should be directed to address the questions raised by the plaintiffs and the intervening plaintiffs concerning the compactness of the specified districts: Legislative districts 29, 38, 51 and 55 and Representative districts 15, 18, 35, 36, 75, 99, 100, 113 and 114.

In *Burris*, this court found that certain districts did not appear to meet the constitutionally mandated requirements. *Burris*, 147 Ill. 2d at 285. Here too, the specified districts do not appear to meet the constitutionally mandated requirements. Those districts certainly do not appear compact based upon a visual inspection, and do not appear compact based upon the mathematic calculations testified to by Richard Niemi, Ph.D. Defendants and intervening defendants respond that any shapes departing from a compactness norm are justified by the influence of other neutral redistricting criteria, including the irregular state, county and municipal boundaries within the State of Illinois, adherence to natural boundaries such as rivers, the preservation of political subdivision and precinct lines and the cores of existing districts, protecting incumbencies, and maintaining communities of interest.

While it is true that departures from the constitutional requirement of compactness possibly may be justified (see *Schrage v. State Board of Elections*, 88 Ill. 2d 87, 98 (1981)), there is no evidence that any such "neutral" criteria were presented to, considered, or accepted by the Commission with regard to those districts in Currie II that do not appear compact. Such evidence must be presented to and considered by the Commission before this court can presume that departures from the constitutional requirement of compactness are valid.

The voters of this state deserve—indeed, demand—fair play. Gone forever are the procedural safeguards, such as notice and cross-examination, that were so

strictly enforced in *Burris*. And gone forever is the Illinois voter's confidence that, while a coin toss might decide which party will draw the map, the highest court of this State will ensure that the process of approving and adopting that map will be equitable, balanced, and fair. We all should expect the party who *wins* the coin toss to be constrained by basic notions of due process and fundamental fairness, so that a democratically devised compromise does not deteriorate into partisan tyranny.

I respectfully dissent.

JUSTICE GARMAN joins in this dissent.

JUSTICE GARMAN, also dissenting:

Today this court comes remarkably close to sounding the death knell to the constitutional requirement of compactness. The majority concludes that "on visual observation, the compactness of the districts formed under the plan before us today is not discernibly different from the compactness of the districts established under the plan approved by this court 10 years ago in *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 296 (1992). While some of the new districts are certainly more elongated than others, the same was true of districts drawn under the old map. Overall, the level of compactness has changed little." 198 Ill. 2d at 237. This court may have eliminated the compactness requirement altogether. The Illinois Constitution of 1970 *mandates* that legislative and representative districts "be compact, contiguous and substantially equal in population." Ill. Const. 1970, art. IV, § 3(a). While the compactness requirement may be subservient to the requirement of equality of population, it "cannot be ignored[,] *** written out or replaced by another requirement short of redrafting or amending our present constitution." *Schrage v. State Board of Elections*, 88 Ill. 2d 87, 96 (1981). Surely, the legislature is

capable of drawing a redistricting plan in which the districts meet all four requirements noted by the majority in that they have substantially equal population, provide fairness to minorities, are compact, and meet all legal requirements regarding political fairness. See *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 296 (1992) (*Ryan II*).

The compactness requirement, along with the other requirements of the Illinois Constitution of 1970, ensures "fair and effective representation for all citizens." *Reynolds v. Sims*, 377 U.S. 533, 565-66, 12 L. Ed. 2d 506, 529, 84 S. Ct. 1362, 1383 (1964). Compactness guards against political gerrymandering and facilitates constituent-representative communication. *Schrage*, 88 Ill. 2d at 96, 100. In upholding the constitutionality of the Commission's redistricting plan against plaintiffs' and plaintiff intervenors' compactness challenge, the majority fails even to define the term "compact," which this court has previously defined as meaning " 'closely united, territorially.' " *Schrage*, 88 Ill. 2d at 95, quoting *People ex rel. Woodyatt v. Thompson*, 155 Ill. 451, 478 (1895).

At the very least, certain districts in the Commission's redistricting plan appear, on their face, to violate the compactness standard of article IV, section 3(a), of the 1970 Illinois Constitution. For example, Legislative District 51, which contains Representative Districts 101 and 102, is an extremely elongated L-shaped district that extends from Macon County in central Illinois to the metro east suburbs of St. Louis in Madison and St. Clair Counties. Plaintiff characterizes this district as a "meandering stream," and the Attorney General concedes that the 51st Legislative District is "probably the closest visual approximation to a classic gerrymander." Further, Legislative District 51 ignores communities of interest by joining urban and rural areas with vastly different and divergent concerns.

Although I am aware that this court must determine the validity of the Commission's plan standing alone, I note that plaintiff intervenors, in their alternate redistricting plan, have taken the counties included in the Commission's Legislative District 51 (Moultrie, Bond, parts of Macon, Shelby, Fayette, Effingham, Clinton, Madison, and St. Clair Counties), and divided them, along with other counties, into two legislative districts that are substantially more compact. Both Legislative District 51 in the Commission's plan, and the plaintiff intervenors' legislative districts, have zero population deviation.[1] Although I recognize that partisan politics plays a role in the redistricting process, article IV, section 3, of the 1970 Constitution is intended to constrain the political impulse. It is possible, despite its political nature, for the Redistricting Commission to submit a map that meets all constitutional requirements. As Justice Clark aptly noted in his 1992 dissent: "while politics and political considerations unfortunately have had more than a subtle influence on [the 1991] proposed map, the resulting analysis conducted by this court must set aside the partisan and special interest bickering and stress the mandate of our State Constitution that the legislative and representative

---

[1]Although defendant and defendant intervenors stress the fact that the Commission's map achieves exact population equality plus one person in some districts, this is not constitutionally mandated. This court noted in *Schrage* that deviations in population equality are permitted to accommodate the interests of political subdivisions and to provide for compact districts. *Schrage*, 88 Ill. 2d at 104. There is a need to consider other interests to "obviate the potential for gerrymandering present in blind adherence to the standard of equality of population. Gerrymandering can be as invidious as malapportionment of population in depriving voters of an equal voice in choosing their representatives. The goal of 'one man, one vote' cannot be achieved without eliminating the use of the gerrymandering as a device to dilute group voting strength." *Schrage*, 88 Ill. 2d at 105, citing J. Edwards, *The Gerrymander and "One Man, One Vote,"* 46 N.Y.U. L. Rev. 879 (1971).

'[d]istricts shall be compact, contiguous, and substantially equal in population.' " *Ryan II*, 147 Ill. 2d at 306 (Clark, J., dissenting), quoting Ill. Const. 1970, art. IV, § 3(a).

Representative District 114 also appears, on its face, to violate the compactness requirement. It is a bizarrely drawn U-shaped district that substantially wraps around Representative District 113. Similarly, Representative District 100 wraps around the 99th Representative District on three sides. Clearly, these districts were severely gerrymandered.

These districts are just a few of the problematic districts in the Commission's redistricting plan. As indicated in Justice Thomas' dissent and as demonstrated by a single cursory glance at the Commission's plan, it is clear this list is not exhaustive.

The majority opinion also fails to address the larger problem that pervades legislative redistricting in the State of Illinois. The process that gave rise to this redistricting plan is fundamentally flawed. Plaintiff intervenors, in both their brief and oral argument, contend that the Commission failed to provide meaningful analysis or discussion of proposed amendments to the redistricting plan which resulted in the creation of the Commission's final plan.

In 1991, in *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270 (1991) (*Ryan I*), this court remanded the redistricting proposal to the Commission based on its perception that to affirm the proceedings of the Commission would "circumvent the spirit and purpose of the Illinois Constitution." *Ryan I*, 147 Ill. 2d at 285. Despite defendants' arguments to the contrary, the 2001 Redistricting Commission proceedings appear fraught with similar procedural vacuity.

Prior to the adoption of the Commission's final plan, entitled Currie II, alternate plans were before the Commission. In fact, a feasible alternate plan is before this

court. As in 1991, it appears that the 2001 final plan was proposed and passed within a 24-hour period. In addition, plaintiff intervenors assert that the proceedings included surprise expert witnesses, witness lists were kept secret, meaningful cross-examination was thwarted, and findings of fact and conclusions of law were minimized. Defenders of the Commission's map contend that ample evidence supported the findings of the Commission. However, after-the-fact rationalization regarding alleged "swing districts" or thin assertions of communities of interest within proposed districts do little to bring the process back in line with the constitutional principles from which it has strayed.

Apparently, it is implied that once the name is drawn to determine which party shall have the tie-breaking vote on the Commission, the process is, for all intents and purposes, complete. See Ill. Const. 1970, art. IV, § 3(b). The intimation is that the losing party should resign itself to the fact that it is out of the process and that partisanship takes precedent. However, "[a]n artificially weighted map may ensure a political party's dominance of a legislative body for a decade or more, but it does not ensure that a citizen's right to elect officials who will represent him effectively is protected." *Ryan II*, 147 Ill. 2d at 307 (Clark, J., dissenting).

In any action involving redistricting, much more is at stake than simply who will control the legislature for the next 10 years. "If any fundamental principle underlies our American system of government, it is the notion that government exists only to serve the governed." *Ryan II*, 147 Ill. 2d at 307 (Clark, J., dissenting). Today, that fundamental principle is dealt a serious blow.

A redistricting plan approved and filed by the Commission is presumed to be valid. Ill. Const. 1970, art. IV, § 3(b); *Schrage*, 88 Ill. 2d at 92. However, the procedures that resulted in the approval of this plan should not be

249

open to the same presumption. Deference to the Commission's findings does not equate to blind adherence to its final product.

Therefore, I respectfully dissent from the majority's opinion and recommend that this plan be remanded to the Redistricting Commission for further action with instructions to submit a map that meets *all* constitutional requirements, including compactness, and to carry forth its duties in a fair and meaningful manner.

JUSTICE THOMAS joins in this dissent.